MILEX PRODUCTS, INC., Plaintiff-Appellee, v. ALRA LABORATORIES, INC., Defendant-Appellant.

Second District   No. 2—91—1411

Opinion filed November 13, 1992.—Rehearing denied December 18, 1992.

Steven M. Kowal, of Burditt, Bowles & Radzius, Ltd., of Chicago (Julian Johnson, of counsel), for appellant.

Goble & Axelrod, of Highland Park (Roger C. Goble, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, Milex Products, Inc. (Milex), filed a complaint against the defendant, Alra Laboratories, Inc. (Alra), seeking damages for breach of contract and a declaratory judgment. Following a bench trial, the trial court entered judgment in favor of Milex in the amount of $3.27 million plus costs of suit. Alra appeals raising the following issues: whether the contract between the parties was invalid because it lacked an essential term; whether there was an obligation to negotiate price in good faith and a failure to do so by either party; whether the trial court erred in assessing damages; and whether certain evidence was properly excluded by the trial court.

By way of background, Milex, founded in 1937, originally manufactured contraceptive diaphragms and vaginal jellies. By 1985, its business had expanded to include a comprehensive line of obstetrical and gynecological specialties with a high concentration in the area of infertility. Alra opened officially as a manufacturer of prescription drugs in 1982. It also manufactures some over-the-counter drugs.

Hymen Milgrom, president of Milex, testified that around 1980 Milex became aware that the patent on the drug clomid had or was about to expire. Clomid is a medication that helps induce ovulation. The active ingredient in clomid is clomiphene citrate. Milex was interested in marketing a clomid-type drug and hired Sol Disman of S & D Associates to survey the market that clomid or other infertility drugs had which were coming off patent. Mr. Disman also recommended Alra as the manufacturer of the proposed new product.

Milgrom testified that in order to market the proposed new drug it was necessary to file an Abbreviated New Drug Application (ANDA) with the Food and Drug Administration (FDA). Unlike the innovator of a drug, who must show the effectiveness, as well as the lack of unknown ill effects, an applicant for an ANDA basically only needs to show that the new product contains the equivalent active ingredients and that the product works as well as the innovator's prod-

uct. Prior to filing for the ANDA, it was necessary to determine who was going to manufacture the product, because the ANDA required specific information as to how the product is made, where it is being made, what equipment is used, and all the controls that go into the manufacturing process.

Milgrom further testified that in the fall of 1984 he and Disman met with Baldev Raj Bhutani, president of Alra, at Alra Laboratories. Bhutani gave a brief history of Alra, and the parties then toured the facilities. Milgrom asked Bhutani if Alra had the capacity to produce two million tablets per year, which was the amount Milex estimated it could sell. Bhutani assured Milgrom that Alra was equipped to produce such an amount. However, Alra was not equipped to do the strip packaging. Milgrom assured Bhutani that there were trade shops that would perform that part of the process. The parties discussed the difficulty of determining a price at that time given the length of time the ANDA procedure took and being in the midst of an inflationary period. Bhutani told Milgrom that he was very interested in doing business with Milex.

Milgrom testified further that after the decision was made to go with the clomiphene citrate-type product another meeting was held at the Alra Laboratories in March 1985. In addition to Milgrom, Disman and Bhutani, Robert Shaw, vice-president of Milex, also attended the meeting. Again Bhutani expressed interest in doing business with Milex and stated he would prepare a letter outlining what services and at what cost he could perform the services for Milex. Although Bhutani questioned Milex's ability to market two million tablets per year, Milgrom assured him that Milex's marketing research confirmed that Milex had that ability and that Bhutani should not be concerned with Milex's ability to take or pay for that amount of tablets.

Milgrom further testified that Alra's research proposal was accepted by Milex on April 2, 1985. The proposal included a confidentiality agreement that forbade disclosure of the formulation work outside of Milex without the written consent of Alra's president. The proposal also provided terms and conditions for Alra's formulation of the product, as well as for the payment for Alra's costs incurred during the formulation process. Paragraph seven provides as follows:

> "7. Alra will have the exclusive right to contract manufacture this product for Milex Products Inc. (at a negotiated price) for two years from the initial marketing of this product by Milex;"

(It is useful to note at this time that although Milex originally agreed to pay Alra approximately $20,000 for 6 months' work, Alra took 18

months and billed Milex over $60,000, which Milex did pay. Fortunately, that is not at issue in this case although it does tend to shed some light on the subsequent actions of the parties.)

Milgrom testified that by early 1987 all of the analytical work was finished and submitted to the FDA. In December 1988, Milex received certification from the FDA to manufacture milophene, a clomiphene citrate product. The certification specified Alra as the manufacturer of milophene. At this point in time, Milex had paid all of Alra's invoices which amounted to over $70,000. Up to this point, there had been no discussion of production or pricing.

Milgrom testified further that in December 1988 he met with Bhutani at Bhutani's office to discuss pricing of the product. Bhutani informed Milgrom that it was not economically feasible for Alra to produce two million tablets and that there was a problem of products liability insurance. According to Bhutani, the only way he would undertake production would be if Milex allowed him to sell the tablet through his own marketing setup. Milgrom assured Bhutani that the insurance was not a problem since Milex would pay for the insurance. However, according to Milgrom this was the first time Bhutani had stated that two million tablets were not enough. Milgrom told Bhutani that his proposal was unfair and asked him to reconsider. A second conversation took place on December 28, 1988, at a Chinese restaurant at the Old Orchard Shopping Center. The meeting was attended by Milgrom, Bhutani, Shaw and Disman. Milgrom explained that Milex was anxious to get the product on the market. The insurance was not an issue any more and would be handled separately. He reminded Bhutani that two million tablets was the amount mentioned in all of the previous discussions and that Bhutani had never told them two million was not adequate. Milgrom attempted to get Bhutani to name a price per piece. Bhutani stated that he would send a letter outlining his position.

The January 12, 1989, letter from Bhutani contained the following pertinent paragraphs:

"5. AS PER CONTRACT TO MANUFACTURE ARRANGEMENT, SEVERAL OPTIONS ARE AVAILABLE.

6. (a) MILEX PURCHASE AND/OR MODIFY THE MANUFACTURING EQUIPMENT AND INSTALL AT ALRA. APPROXIMATELY COST $55,000. ALRA WILL DEDUCT 10% FROM EACH INVOICE TOWARD THIS EXPENSE UNTIL ALL $55,000 IS PAID UP.

(b) COST OF MANUFACTURING WILL BE PRICED AS $45/HR.—PRODUCTION; $60/HR—QUALITY CONTROL

AND $100/HR—FDA RELATED WORK. THE COST OF SUPPLIES WILL BE CHARGED AT COST PLUS 20% FOR OVERHEAD TO COVER HANDLING/ACCOUNTING ETC.

(c) ANOTHER WAY OF PRICING COULD BE $20 PER 1000 TABLETS WHICH COMES TO .60 PER PACK OF 30 TABLETS, PLUS COST OF SUPPLIES AT COST PLUS 20% FOR OVERHEAD TO COVER HANDLING/AC-COUNTING ETC.

7. ALRA WILL EXPECT A MINIMUM OF $100,000/YR FROM MILEX FOR THIS PRODUCT WHICH COMES TO APPROX. 10 WORK ORDERS PER YEAR. IF MILEX DOES NOT GENERATE THIS MINIMUM BUSINESS. THEY WILL STILL BE BILLED FOR $25,000 PER 3 MONTHS OR $16,667 PER TWO MONTHS PAYABLE IN ADVANCE.

8. THIS MINIMUM REQUIREMENT LISTED IN ITEM 7 AND EQUIPMENT EXPENSES LISTED IN ITEM 6a MAY BE WAIVED IF MILEX WILL ALLOW ALRA TO SELL TO GENERIC DISTRIBUTORS, MILOPHENE UNDER ALRA'S LABEL. ARRANGEMENTS COULD BE MADE SUCH THAT ALRA WILL NOT COMPETE DIRECTLY WITH MILEX. UNDER THIS ARRANGEMENT ALRA WILL NOT PRIVATE LABEL FOR ANYONE ELSE.

9. IF MILEX ALLOWS ALRA TO EXCLUSIVELY DIS-TRIBUTE MILOPHENE UNDER ALRA'S LABEL AND UN-DER OTHER PRIVATE LABELS.

THEN THE MINIMUM REQUIREMENTS LISTED IN ITEM 7 AND EQUIPMENT EXPENSES LISTED IN 6a MAY BE WAIVED. IN ADDITION MILEX WILL RECEIVE UP TO 50% OF ALRA'S GROSS PROFITS FOR THIS PRODUCT. PAYABLE EVERY QUARTER."

On cross-examination, Milgrom testified that the two million tablet figure came as a result of marketing research. Milex was aiming at $3 per tablet. Milgrom had problems with Bhutani's proposal which called for 10 work orders per year or a minimum of $100,000 because at two cents per tablet (Item 6c), five million tablets would have to be sold, not the two million the parties had discussed. Milex never suggested a specific price. According to Milgrom, Milex is not presently marketing milophene or any other clomiphene citrate product.

Robert Shaw testified that he is vice-president and owner of 50% of Milex. He confirmed Milgrom's testimony as to the events leading up to the signing of the research proposal from Alra. He was also

present at the meeting with Bhutani at the Chinese restaurant late in December 1988. Approximately two weeks later (January 12, 1989), he received a fax from Bhutani. After speaking to Milgrom, Shaw called Bhutani and informed him that the proposal was unacceptable especially in light of the fact that it contained stipulations which he had already been told very specifically at the December meeting were unacceptable. Shaw demanded that Bhutani give Milex a price per tablet with no "hookers." On or about March 2, 1989, he received another fax from Bhutani; however, it reflected no changes in his position. Shaw again called Bhutani and told him that unless he was willing to give Milex a piece price with no strings attached, Milex would look for another manufacturer. More letters were exchanged, but late in March or early in April 1989 Milex began to seek another manufacturer.

Shaw testified further that late in April Milex reached an agreement with Butler, another manufacturer, to manufacture milophene. However, Butler was purchased by another firm and ceased the work for Milex at the end of 1989. Milex proceeded with Medicopharma, another manufacturer in approximately May 1990. However, both Butler and Medicopharma had difficulty reproducing Alra's results. In order to obtain another ANDA, all of the chemistry work had to be resubmitted. In addition, all of the work originally done by Alra had to be redone by the new manufacturer because they were using different equipment and they might be using different procedures. Shaw denied that Medicopharma had received any information from Alra's master drug file.

On cross-examination, Shaw testified he did not understand Bhutani's proposal to be a piece price because the offer specified other things that had already been rejected by Milex. On the other hand, had Bhutani proposed 10 cents per tablet (what the cost per tablet would have been if Milex had agreed to the entire proposal, which included insurance), Milex might have paid it. One of the major oppositions Milex had to the proposal was Alra's selling the tablets to other people. Shaw understood item nine to present a different option only in that it relieved Milex of certain of the other requirements.

Shaw further testified that in January 1990 he contacted several companies as potential suppliers. One supplier, Korsch, quoted one cent per tablet, and Medicopharma quoted less than one cent per tablet.

Eileen Mele, a vice-president of Marsh McLennan, an insurance brokerage house, testified that in mid-October 1989 she was contacted by Milex to procure products liability insurance for milophene. Mr.

Shaw asked her to name Alra as a named insured on the policy. She was able to obtain a company to place the insurance with and a price quote and so informed Mr. Shaw. Both Milgrom and Shaw asked her to contact Alra, but none of her calls were returned. When she did reach Bhutani, she told him that she had learned from Milex that he was having difficulty securing liability insurance and that she could assist him. However, when she informed Bhutani that she would not know the cost until the application was completed and reviewed, he told her he did not need her.

On cross-examination, Mele testified that she had been unable to obtain any co-insurance and would need to sell Alra a new policy. On redirect examination, she testified that Shaw and Milgrom had told her that Milex would pay Alra's premium.

Over the objection of the defendant, Fredric Price, a consultant to pharmaceutical businesses, testified that he was retained by Milex to assess the damages incurred as a result of not having a clomiphene product on the market. He began by gathering market research on the two clomiphene products presently on the market to determine such things as the prices at which the products were sold, the number of prescriptions in the marketplace, and the average size of a prescription in order to determine the basic economic structure of the clomiphene citrate market. One of the sources he used was an audit put out by IMS, the largest data collection and information business in the pharmaceutical industry. An audit takes a representative sample, and assuming that the sample is done correctly and that the sample size reflects the same geographic and demographic values as the population at large, the sample size is then projected to a national average. Another source, Price Alert, published by First Data Corporation, provided him with pricing data. Price Alert is considered to be an authoritative source of information in the pharmaceutical industry. The prices in Price Alert are a mixture of manufacturers' and wholesale prices. Price Alert also provides a direct price for 10% to 20% of the products it lists. The direct price is the price at which on an average, including all of the volume discounts that a pharmaceutical company gives to any customer, is its average price to all classes of trade.

Price further testified that in trying to determine Milex's losses he examined what happened in the marketplace when a product loses patent status and competitors come in to the market with generic copies. He looked at a variety of products under many different kinds of scenarios over a wide period of time. According to Price, one pattern in pricing was that the innovator company almost always raised the price of its product prior to the expiration of its patent.

Using the information from a spread sheet he produced, Price testified that his figures for the two other clomiphene citrate products without Milex in the market for 1986 through one-half of 1990 were based upon audits while his figures for the second half of 1990 and 1991 through 1993 reflected a forecast. Price also determined an average wholesale price and total prescriptions. Using the same methodology and allowing three months following the approval of the ANDA to accomplish the administrative things necessary to launch a new product, Price assumed Milex's product would be introduced on April 1, 1989. Thus, his figures for Milex would include three-quarters of 1989 plus 1990 through 1993. He then calculated the same information for the original two products singly and combined after Milex was in the market. That gave him the impact of Milex on the marketplace. He further took into consideration price discounts that were offered. and what he forecast for the other years for all three products. Price further assumed in his calculations that there would be no market growth although some data suggested there would have been. Price calculated Milex's lost sales by taking the number of prescriptions it would have sold times the average wholesale price of a unit of sale, adjusted for the fact that a unit of sale was not in fact three times the size of the prescription. That amount is then reduced by 50% as the pretax margin, which is the cost ·of sales plus marketing expenses subtracted from sales. Price also added $100,000 in additional expenses (for each year except 1993) which would have been incurred as a result of not having the lost sales, such as the cost of hiring someone like Price. He calculated the loss per year and arrived at a cumulative figure for a total loss of $7,481,000 from 1989 through 1993. Based upon the different scenarios he put together, in Price's opinion, Milex lost between $7.5 and $11.5 million. His calculations did take into consideration expenses Milex had already paid out to Alra.

On cross-examination, Price testified that his projections would change if a fourth company entered the marketplace for the years 1991, 1992 and 1993. Price arrived at Milex's 10% of the market share as a result of looking at market share gains made by 20 to 30 other drugs with similar characteristics. He did not have statistical information on the success of Milex's versus its competitors' marketing plans.

Bertrand J. Laprade, director of regulatory affairs at Alra and a pharmacist, testified that he reviewed one of the scenarios put together by Mr. Price and concluded that Price's assessment of damages was overstated. While he verified that Price's average wholesale

price was correct, he determined that in fact a pharmacist actually pays 14% less than the average wholesale price or actual acquisition cost. In addition, the distributor generally gets between 17% and 20% for its services. Using Price's figures and the two discounts, Laprade concluded that in 1991 Milex would have sold $808,331 worth of tablets.

On cross-examination, Laprade agreed that Milex's product would have generated sales. He admitted that if Price's wholesale price and prescription figures were accurate, the validity of his (Laprade's) calculations would be called into question. Laprade did not use Price Alert or IMS data. On redirect examination, Laprade testified that he did use the Annual Pharmacists Reference Book, which is a price book and is considered authoritative by pharmacists.

Baldev Raj Bhutani, president of Alra, testified that in the fall of 1984 he was contacted by Sol Disman regarding a clomiphene citrate project. In November or December 1984, Bhutani met with Milgrom and Disman in his office at Alra. According to Bhutani, Milgrom and Disman spent most of the meeting convincing him that Milex was a reliable company and wanting to involve him in the project. After a tour of the plant, Bhutani told Milgrom that he would consider getting involved. In January 1985, a proposal from Alra was sent to Disman. Another meeting at Alra took place late in February or in March 1985 attended by Disman, Milgrom, Shaw and Bhutani. More changes to the proposal were made. Finally, a third proposal was submitted to Milex and signed by both parties.

Bhutani testified that in November 1988 Milgrom came to his office for a meeting. They discussed how Milex wanted to market the tablets but did not discuss pricing. A second meeting was held in December 1988 attended by Milgrom, Shaw, Bhutani, Disman and Arnold Winfield, also of S & D Associates. Several matters were discussed at the meeting. According to Bhutani, two million tablets was brought up as a starting point. Bhutani expressed his concern over the insurance issue, which he had brought up several times between 1985 and 1988. Several alternatives on the insurance question were proposed by Milex.

Bhutani further testified that he faxed a proposal to Milex. His proposal contained several options because he did not know what was or was not acceptable on the basis of the December meeting. He also believed that Milex had not as yet come up with a marketing plan. Item 6c of the proposal contained a unit price. It was his understanding that he had given Milex all of the available options. The $55,000 equipment option was for an additional granulation and blending area

to keep the clomiphene citrate away from other products being manufactured because of its harmful effects. After two weeks, when he had had no response from Milex, he called Milgrom, who was not available. The call was returned by Shaw, who told him that they did not like the proposal, that it was "highway robbery," and finally hung up on Bhutani. After that telephone call, a series of letters were exchanged between the parties which culminated in Milex requesting the return of certain materials Milex had purchased from Alra and threatening legal action unless they were returned. Alra, on the other hand, questioned Milex's knowledge of the research aspects of prescription pharmaceuticals and reminded Milex of the confidentiality agreement the parties had signed.

Bhutani further testified that the agreement Milex entered into with Butler called for a higher price for the product than he had quoted. According to Bhutani, he only charged half his normal research fee and was hoping to recoup Alra's cost over the five-year period in the proposal.

Following closing arguments, the trial court found that the parties had entered into a valid contract on or about April 2, 1985; that Alra had an obligation to negotiate a price for the clomiphene citrate product fairly and in good faith; that Alra failed to act in good faith and failed to negotiate a price for manufacturing the product and deliberately rather than inadvertently added unreasonable terms and conditions so as to preclude a reasonable negotiation; and that Milex had acted in good faith in its negotiations with Alra. The trial court also found that Milex had been damaged substantially by Alra's failure to negotiate in good faith and that Price was a very credible witness whose opinion was not based upon guess or conjecture but upon fact. The trial court noted that in assessing damages it had adopted the lowest figure contained in the various ranges presented. Judgment was entered for Milex as stated above. This appeal followed.

■■ Alra contends, first, that the trial court erred in finding that the parties entered into a valid contract on April 2, 1985, since, because the contract did not provide a price, it was void and unenforceable. A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract. *Academy Chicago Publishers v. Cheever* (1991), 144 Ill. 2d 24, 30.

Regarding price, the April 2, 1985, contract provided as follows:

"Alra will have the exclusive right to manufacture this product for Milex Products Inc. (*at a negotiated price*) for two years

from the initial marketing of this product by Milex." (Emphasis added.)

■■ Section 2—305 of the Uniform Commercial Code (Ill. Rev. Stat. 1985, ch. 26, par. 2—305) provides in pertinent part as follows:

"(1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

(a) nothing is said as to price; or

(b) the price is left to be agreed by the parties and they fail to agree; or

(c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

(2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

(3) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price.

(4) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract."

Alra argues that since price was never discussed until the ANDA was approved, the evidence established that the parties did not intend to be bound until the price was established. We disagree.

■■ According to the testimony, the question of price had come up at the very beginning of the negotiations which led up to the contract of April 2, 1985. Both Milgrom and Shaw testified that the subject of price was discussed at the two meetings prior to the signing of the April 2, 1985, contract and that the parties agreed that it would be too difficult to set a price at that time. In particular, Shaw testified that Bhutani himself brought up the fact that it would be difficult for him to set a price at that time, to which, given the inflationary period, they had all agreed. Moreover, the contract prepared by Alra refers to a "negotiated price." Thus, we are of the opinion that there was sufficient evidence from which the trial court could conclude that the parties did intend to conclude the contract even in the absence of a settled price.

The cases relied on by Alra are distinguishable: *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.* (7th Cir. 1989), 873 F.2d 155 (letter of intent provided that it was subject to concluding an agreement of sale acceptable to the board of di-

rectors, who then refused to approve the sale); *Feldman v. Allegheny International, Inc.* (7th Cir. 1988), 850 F.2d 1217 (the letter of intent, sought to be enforced, stated on its face that it was not binding); *Quaker State Mushroom Co. v. Dominick's Finer Foods, Inc.* (N.D. Ill. 1986), 635 F. Supp. 1281 (court determined that there was a complete failure of understanding between the buyer and seller as to the price); and *Academy Chicago Publishers v. Cheever* (1991), 144 Ill. 2d 24 (the agreement between the parties could not be enforced due to several critical omissions).

We conclude, therefore, that the trial court did not err in determining that there was a valid contract between the parties.

Alra contends, next, that the trial court's finding that Alra failed to negotiate a price in good faith was against the manifest weight of the evidence.

■ The obligation to negotiate in good faith has been generally described as preventing one party from renouncing the deal, abandoning the negotiations or insisting on conditions that do not conform to the preliminary agreement. (*A/S Apothekernes Laboratorium*, 873 F.2d at 158.) For instance, a party might breach its obligation to bargain in good faith by unreasonably insisting on a condition outside of the scope of the parties' preliminary agreement, especially where such insistence is a thinly disguised pretext for scotching the deal because of an unfavorable change in market conditions. (873 F.2d at 158.) The full extent of a party's duty to negotiate in good faith can only be determined, however, from the terms of the letter of intent itself. 873 F.2d at 158.

■ Instead of a letter of intent, we are dealing with the contract between the parties. The contract made no mention of insurance, and there was testimony from both Milgrom and Shaw that the subject of insurance was never raised until the meeting in December 1988. Milgrom testified that Bhutani assured him that Alra's facilities were adequate to manufacture the proposed product. Milgrom also testified that no amount other than two million was ever discussed as far as the number of tablets to be manufactured by Alra yearly. There was no suggestion either written or oral that Alra market the product on its own or in conjunction with Milex unless Milex ceased to do so. We agree that the duty to bargain in good faith does not prohibit a party from bargaining to its own economic advantage. (*Phoenix Mutual Life Insurance Co. v. Shady Grove Plaza Limited Partnership* (D. Md. 1990), 734 F. Supp. 1181, 1190.) However, it is not an unreasonable inference that with Milex "locked in" to Alra as the manufacturer, Bhutani tried to take advantage of the situation to force Milex to ac-

cept terms that had not been contemplated in the original contract and were not ecomonically feasible for Milex.

We conclude that the trial court did not err in determining that Alra failed to negotiate in good faith.

Alra contends, next, that the trial court erred in assessing Milex's damages. Alra offers several arguments on this point.

■ First, Alra argues that damages should not have been awarded since the contract provided that Alra would not be responsible for consequential damages. The contract specifically provided as follows:

> "Alra will complete this project within 6 months after this proposal is accepted and supplies are made available for the work to begin. Alra assumes no liability for any formula changes by Merrell Dow during this period or for any delay in completion of this project due to causes beyond its control, such as acts of God or interruption of services or supplies, and will not be responsible for any consequential damages."

A contract must be interpreted not merely by reference to particular words or isolated phrases but by considering the contract as a whole. (*Shelton v. Andres* (1985), 106 Ill. 2d 153.) Alra's sole conclusion (unsupported by authority) is that a reasonable inference from the language is that the above-quoted provision applies to the entire contract just as the confidentiality requirement applied at any time during the course of the contract. However, unlike the reference to damages, the confidentiality portion of the agreement was contained in a separate paragraph only dealing with confidentiality whereas the language as to damages was included in the paragraph dealing with the length of the research proposal. We are of the opinion that a more reasonable conclusion would be that the language pertaining to damages was limited to the subject of the paragraph in which it was included.

■ Secondly, Alra argues that the damages for lost profits were not within the contemplation of the parties. Lost profits will be allowed only if: their loss is proved with a reasonable degree of certainty; the court is satisfied that the wrongful act of the defendant caused the loss of profits; and the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into. (*Spangler v. Holthusen* (1978), 61 Ill. App. 3d 74, 81.) When the profits which are sought are those arising out of the breached contract, those profits are considered one of the elements of the contract and are presumed to have been within the contemplation of the defaulting party at the time he entered into the contract; they are recoverable if proved with reasonable certainty. (*Spangler*, 61 Ill.

App. 3d at 81.) " 'However, when the profits sought are those which would have arisen only out of a collateral transaction, not only must these profits be proved with reasonable certainty, but also it must be shown that they were reasonably made within the contemplation of the defaulting party when the contract was made.' " 61 Ill. App. 3d at 81, quoting *Rivenbark v. Finis P. Ernest, Inc.* (1976), 37 Ill. App. 3d 536, 538-39.

In *Spangler*, Holthusen, a land developer, entered into an installment contract with the Spanglers for the purchase of a farm for $140,000. Holthusen then entered into an agreement with a third party to sell his interest in the farm for $293,250. When the initial transaction failed to be consummated, Holthusen sued the Spanglers seeking the lost profit from the second transaction. This court held that it was not sufficient that the Spanglers knew that Holthusen was in the land development business and that without knowledge of the collateral transaction the Spanglers could not be held responsible for the lost profit from that transaction.

■■ The situation in the case at bar does not involve a "collateral" transaction. The contract entered into by the parties in this case clearly contemplated the manufacture and marketing of the clomiphene citrate product. The April 2, 1985, contract which would allow Alra to market the product if Milex chose not to do so and Bhutani's proposal of January 12, 1989, which contemplated Alra's marketing the product in conjunction with Milex certainly indicated that Alra was aware of the profit to be made in the manufacture and marketing of the product. We conclude that Alra has not rebutted the presumption that profits were within the contemplation of the parties.

Alra again argues that there was no valid contract and that Alra was not guilty of bad faith. We have previously addressed both arguments and will not repeat them here.

Third, Alra argues that damages here were not the result of the interruption of an existing business and were based upon the speculation and conjecture of Milex's expert witness, Price.

■■ The long-standing rule in Illinois is that lost profits may be a measure of damages where a business is interrupted, but the business must have been established prior to the interruption so that the evidence of lost profits is not speculative. (*Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.* (1986), 143 Ill. App. 3d 168, 174.) The reasoning behind the rule is the lack of certainty in showing lost profits for a new business that has yet to show what its profits actually are. In *Drs. Sellke & Conlon*, the plaintiff's orthodontic office was a new business, and his offer of proof consisted solely of profits realized af-

ter defendant's tortious interference had ceased. This court found that the proffered evidence was insufficient to establish plaintiff's lost profits with a reasonable degree of certainty.

In the case at bar, the trial court specifically found that Milex's expert, Price, was very credible and that his opinion about Milex's lost profits was based upon fact, not speculation. Price's testimony concerning lost profits was based upon actual products in the marketplace as well as authoritative sources for the data he used. Alra's own expert, Laprade, admitted that Milex would have had lost profits.

In *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, our supreme court upheld a trial court award of damages to a theatre which had lost substantial business as a result of noxious odors emitted by a nearby manufacturing plant. While discussing a case the lower court had relied on to reverse the award on the basis that the damages were speculative, the court stated:

> "We do not interpret [*Barnett v. Caldwell Furniture Co.* (1917), 277 Ill. 286,] to hold that evidence of prior profits is the *sine qua non* of proof of damages suffered by a business enterprise. The significant holding found in the opinion is stated on page 289, as follows: 'It is perhaps true that absolute certainty as to the amount of loss or damage in such cases is unattainable, but that is not required to justify a recovery. All the law requires is that it be approximated by competent proof. That proof of the exact amount of loss is impossible will not justify refusing compensation. If that were the law, contracts of the kind here involved could be violated with impunity. All the law requires in cases of this character is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages.' " (*Schatz*, 51 Ill. 2d at 147-48.)

In somewhat similar situations to the case at bar, courts have found that the rule that a new business' profits are too speculative did not fit the circumstances before them. *E.g., Malatesta v. Leichter* (1989), 186 Ill. App. 3d 602 (plaintiff prevented from acquiring car dealership; profits of the person who operated the dealership during the time in question held not to be too speculative to prove damages); *Fishman v. Estate of Wirtz* (7th Cir. 1986), 807 F.2d 520 (plaintiffs who had never owned a sports franchise awarded lost profits based upon the profits made by the team owners); *Rhodes v. Sigler* (1976), 44 Ill. App. 3d 375 (court found evidence of profits of a person other than the plaintiff in the same period of time plaintiff was seeking damages provided required degree of certainty).

Finally, we do not believe that the case of *Drs. Sellke & Conlon, Ltd.* stands for the inviolate rule that a new business can never prove lost profits. That case determined that where lost profits are based solely upon speculation, such proof is inadequate to establish lost profits within a reasonable degree of certainty. However, in the case before us, while the product is a new one, the evidence showed it to have an established market. Given that fact, together with Price's testimony, we conclude that the proof of lost profits was neither speculative nor the product of conjecture but was based upon a reasonable degree of certainty.

■■ Fourth, Alra argues that Milex failed to mitigate damages. However, there is ample proof in the record that immediately after negotiations with Alra were halted Milex sought out other manufacturers. The fact that the product is not yet on the market is due to the necessity of redoing Alra's work as required by the FDA. We are of the opinion that damages for lost profits were properly awarded in this case.

■■ Finally, Alra contends that the trial court erred in excluding certain testimony as to conversations between Sol Disman and Bhutani. Disman was deceased at the time of trial.

Generally an offer of proof is necessary in order to preserve for review a question of whether the trial court improperly excluded certain evidence. (*Goad v. Evans* (1989), 191 Ill. App. 3d 283, 298.) In one instance, the attorney for Alra indicated that the testimony of the conversations between Bhutani and Disman was only for the purpose of establishing the fact of the conversations, and the trial court permitted the testimony. In the other instances, Alra made no offer of proof. Unlike the situation in *Goad*, the record does not reflect that the attitude of the trial court prevented Alra from making the appropriate offers of proof. (*Goad*, 191 Ill. App. 3d at 299.) Alra's argument is waived. See *Healy v. Bearco Management, Inc.* (1991), 216 Ill. App. 3d 945, 957.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

UNVERZAGT and GEIGER, JJ., concur.