2022 IL 127903

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 127903)

ROGER IVEY *et al.*, Appellants, v. TRANSUNION RENTAL SCREENING
SOLUTIONS, INC., Appellee.

*Opinion filed November 28, 2022.*

CHIEF JUSTICE THEIS delivered the judgment of the court, with opinion.

Justices Anne M. Burke, Neville, Michael J. Burke, Carter, and Holder White
concurred in the judgment and opinion.

Justice Overstreet dissented, with opinion.

**OPINION**

¶ 1    The sole issue in this case is whether the appellate court erred in affirming the
Cook County circuit court's decision to grant summary judgment for defendant
Transunion Rental Screening Solutions, Inc. (TURSS), and against plaintiff Helix
Strategies, LLC (Helix). The appellate court held that Helix failed to present proof

of its damages with reasonable certainty. 2021 IL App (1st) 200894, ¶ 56. For the reasons that follow, we affirm the appellate court's decision.

¶ 2                                       BACKGROUND

¶ 3        In 2007, Roger Ivey served as an assistant vice president and property operations counsel of UDR, Inc., a publicly traded real estate investment trust and one of the country's largest owners and managers of residential apartment properties. In that position, Ivey was heavily involved with creating the industry's only standard commercial lease product, offered by the National Apartment Association (NAA), a nonprofit national trade organization, to its dues-paying members. Believing that he could develop a better alternative, Ivey met with Michael Britti, vice president of TURSS, a Delaware corporation with offices in Illinois and a subsidiary of the credit reporting agency Transunion, LLC. TURSS provided background and credit screening services to property management professionals and landlords through its MySmartMove online platform, which was directed at small-portfolio customers, and its CreditRetriever online platform, which was directed at large-portfolio customers. Ivey and Britti discussed whether TURSS could build an online platform to sell customizable, electronic lease forms to its MySmartMove and CreditRetriever customers.

¶ 4        In July 2008, Britti presented Ivey with a five-year business plan under which Ivey would create a database of forms and TURSS would market the forms to its customers. The plan projected profits of more than $23 million from sales to MySmartMove customers alone. In September 2008, Ivey left his position at UDR, Inc., to form Newco, LLC, which later became Helix, a Colorado "document and information services company," where he acted as president and chief executive officer. In November 2008, TURSS sent Helix a letter of intent that the platform would be completed during the first quarter of 2009.

¶ 5        In March 2009, Helix and TURSS memorialized their negotiations in a five-year marketing agreement that required TURSS to provide the platform and Helix to provide the product. TURSS would receive 35% of the revenue generated from the sales of those products, and Helix would receive 65%. The agreement, however, was not exclusive and provided, "Nothing in this Agreement shall prevent Helix from independently marketing and selling its products to and through any and all

third parties, including, without limitation, to TURSS'[s] Subscribers and competitors, without obligation to TURSS." And TURSS could partner with other vendors to provide similar forms to its customers. Pursuant to the agreement, Helix provided electronic forms and supporting materials to TURSS.

¶ 6    In August 2009, Britti left TURSS. His replacement, Mike Mauseth, regularly spoke with Ivey about TURSS's progress on the electronic platform. In September 2009, a TURSS business analyst told Ivey that TURSS would complete the platform by the end of the year. It did not, due to what TURSS characterized as "a domino-effect" of stability issues with its CreditRetriever and MySmartMove platforms. In February 2010, Mauseth and other TURSS employees told Ivey that TURSS had not yet "allocated sufficient resources to complete the platform" but "was committed to building the platform and selling Helix services." TURSS represented that the lease product platform would be rolled out within months.

¶ 7    In March 2010, TURSS agreed to amend the marketing agreement, extending it for five years from the date that TURSS would first offer Helix's services to its customers. The amendment stated that TURSS anticipated that the platform would be completed "approximately in June 2010." The amendment also stated, "The extension of the Agreement will not be construed as an approval by Helix of unreasonable delays, if any, by TURSS in performance of the Agreement." In June 2010, Mauseth told Ivey that the platform would be completed "more toward the end of August." At the end of 2010, the platform was not completed. It was still not completed by the end of 2011.

¶ 8    In January 2012, Ivey spoke with Mauseth and Timothy Martin, TURSS's vice president of U.S. housing, to express his frustration with the project delays. Martin reiterated TURSS's commitment to build the platform but added that work on it would not begin until the summer of 2013 and could be postponed. In February 2013, Martin asked a TURSS employee to evaluate the project. The employee said that the project was "straightforward" and that the company "should be able to support this." Martin responded that he was unsure whether Helix still existed at that point and instructed the employee to wait until TURSS was "ready" before figuring that out. In October 2014, Ivey contacted TURSS. TURSS employees disclaimed any knowledge of the project and could not locate the marketing agreement or identify anyone in the company familiar with it. In an e-mail to Ivey,

an employee stated that "no one is left at TURSS who was involved in the Helix project."

¶ 9        On July 20, 2015, Ivey and Helix, as plaintiffs, filed a four-count complaint against TURSS. Count I, brought by Helix, alleged "willful and intentional" breach of contract. Counts II, III, and IV, brought by both Ivey and Helix, alleged fraud, negligent misrepresentation, and promissory estoppel. Nearly a year later, TURSS filed a motion for summary judgment.

¶ 10        The plaintiffs' response included an affidavit from Ivey. There, Ivey stated that he "created a unique lease system for 48 of the 50 states and D.C. that was designed specifically for integration into an electronic software operating platform." Ivey added that his product was not "simply forms" but "the backbone to integrate the entire lease process, from lease template creation, to applications, screening, approval, lease completion, electronic lease execution, and finally, document storage and retention." According to Ivey, he took "enormous care in crafting" what he believed to be "the highest quality national product in existence, and it had many unique qualities."

¶ 11        On April 15, 2016, Ivey gave a discovery deposition. After outlining his education and employment background, he discussed his idea to create a lease product. Ivey enjoyed brainstorming with Britti and talking about "new products." Ivey gave Britti "ideas of what they could do with their screening data and repackage that and turn that into products that would be useful to landlords." In the course of those conversations, Ivey became "aware that there [were] gaps in the market for a quality lease product" and "aware of the fact that there was a market demand for a different product." Ivey outlined several ways in which the NAA lease was lacking and stated, "as someone who tries to be creative, I said good grief, we could do this better." According to Ivey, a law firm could create a good lease, "but it is not going to be integrated into an electronic operating system," and consequently, "it is a different animal in a lot of ways."

¶ 12        The trial court granted TURSS's summary judgment motion as to counts I, III, and IV but allowed the plaintiffs to replead count II. The plaintiffs filed a motion to reconsider the trial court's ruling on their breach of contract and promissory estoppel claims. Before the court ruled on that motion, the plaintiffs filed a three-count amended complaint, alleging breach of contract, fraud, and promissory

estoppel. TURSS then filed a combined motion to dismiss under section 2-619.1 of the Code of Civil Procedure. 735 ILCS 5/2-619.1 (West 2016). After briefing and argument on both motions, the trial court granted the plaintiffs' motion to reconsider but ultimately dismissed the amended complaint with prejudice. The trial court concluded that Helix had failed to identify recoverable damages. The plaintiffs appealed.

¶ 13     The appellate court dismissed the appeal for lack of jurisdiction, finding that, while the trial court dismissed the plaintiffs' repleaded fraud claim, the trial court had not definitively disposed of the breach of contract and promissory estoppel claims. *Ivey v. TransUnion Rental Screening Solutions, Inc.*, 2018 IL App (1st) 171592-U. On remand, the parties took divergent approaches. The plaintiffs filed a motion to reconsider the ruling on their promissory estoppel claim and Helix's breach of contract claim. TURSS filed a motion for entry of final judgment. The trial court denied TURSS's motion and dismissed Ivey's claims with prejudice. The case proceeded on only Helix's breach of contract claim, and Helix was ordered to disclose experts. Helix disclosed Paul Cohen and Stan Smith and submitted reports from them to support its claim for lost profits.

¶ 14     Cohen opined that Helix's products were "a far superior product than any similar product on the market" and "the perfect product at the perfect time." According to Cohen, Helix's leases and documents were "of the highest quality in the industry" and "fully customizable, making them very desirable." According to Cohen, other lease products, including the NAA lease, were "flawed and inferior" to those offered by Helix. Cohen estimated that Helix would have generated $20,321,000 in revenue from small landlords during the five-year period of the marketing agreement, roughly the same as TURSS's projection of $20 million. Cohen further estimated that Helix would have generated $41,615,057 in revenue from large landlords during those five years. That amount could have risen to $82,615,057, based on TURSS's advantages over the NAA. In total, Cohen projected that Helix would have made more than $102,936,000 from sales of its products on TURSS's platform.

¶ 15     Smith concluded that Helix's lost revenue during the five-year period of the marketing agreement was $42,949,247. Smith surmised that Helix suffered additional losses beyond those five years. According to Smith, Helix lost revenue

ranging between $71,129,996 and $96,185,884 from forgone lease sales to small landlords and $49,400,469 from forgone lease sales to large landlords in the 10-year period after the marketing agreement period ended. Together, those amounts totaled $120,530,266 to $145,586,153.

¶ 16     TURSS filed another motion for summary judgment, arguing, *inter alia* and for the first time, that Helix's claim for lost profits was speculative and not recoverable under the new business rule. Helix responded that the reports from Cohen and Smith provided a reasonable basis to calculate its lost profits. After briefing and argument, the trial court granted TURSS's motion for summary judgment. Helix filed a motion to reconsider, which included two more affidavits from Ivey.

¶ 17     In the first affidavit, Ivey stated that, when he transacted with TURSS, he had been engaged in providing lease document content for sale for many years: "My combined experience at UDR, with the NAA lease, and in preparation for the Helix products shows that providing lease content and information was in no way a 'new business' for me. The fact that I was creating content under a new LLC is simply a matter of form over substance." Ivey surmised that, in 2008, "service providers to the residential leasing industry were behind the national products curve in several important ways." According to Ivey, there were "no high quality lease products" that were integrated into electronic platforms, and the existing platforms "were limited and did not integrate the entire lease process." Ivey hoped to fill the gap for those "missing products and services."

¶ 18     Ivey stated that the NAA lease was an early leader in the industry but it had significant deficiencies. He listed several of them. The NAA lease was modeled after the Texas Apartment Association Lease, which was "not a good fit in a large number of other states." The NAA lease was expensive, unpredictable, long, and cumbersome. The NAA was "slow to make changes and updates" and provided only a limited number of forms, which could not be customized by landlords. The NAA platform was not integrated with screening or other software. Finally, the NAA lease "had provisions that could harm landlords." Helix's products were "intentionally designed" to address those issues. And Helix's message in the industry was that it was "doing a product with Transunion on a new platform."

¶ 19     In the second affidavit, Ivey stated, "While there were differences between the Helix lease and the NAA lease, to the extent the Helix lease was different, these

differences were improvements over the NAA lease." Ivey insisted that he "drafted the Helix lease to have all of the same capabilities as the NAA lease but with enhancements and additional capability. The Helix lease had virtually everything the NAA lease had *and more*." (Emphasis in original.) Ivey reiterated the deficiencies in the NAA lease and noted how the Helix lease was better. The Helix lease was shorter than the NAA lease, and "it covered the same topics but more succinctly." The NAA lease had a "poison pill" that allowed tenants to terminate the lease if the landlord allowed its NAA membership to lapse; the Helix lease had no such provision. The NAA lease was not customizable; the Helix lease was "excellent out of the box but was designed to allow landlords to select alternative clauses and to draft their own clauses and forms to suit their unique needs." The NAA lease purportedly "educated" and "encouraged" tenants to sue landlords; the Helix lease was fair to both sides. The NAA lease was "in a very small font and double columned format on legal size paper"; the Helix lease had a larger font in a single column on letter-size paper. And the NAA lease was not integrated into one platform with tenant screening and other services; the Helix lease was.

¶ 20        Several months later, the trial court entered a written order denying Helix's motion to reconsider and granting TURSS's motion for entry of final judgment. The order stated that it "disposes of all matters before the Court, and the case is closed." Helix appealed.

¶ 21        A divided panel of the appellate court affirmed. 2021 IL App (1st) 200894. The appellate court majority initially noted that, in a breach of contract case, a plaintiff must prove actual damages from the breach. *Id.* ¶ 39. Further, the plaintiff must establish a reasonable basis for computing damages. *Id.* The majority then turned to the new business rule, which precludes expert witnesses from speculating about a new business's lost profits. *Id.* ¶ 40. The reason for that rule is that a new business has not shown what its profits actually are. *Id.* (citing *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 284 Ill. App. 3d 417, 427 (1996)). Whether a business is new under the rule depends on whether it has a track record of profits from which to estimate its alleged lost profits. *Id.* ¶ 41 (citing *Meriturn Partners, LLC v. Banner & Witcoff, Ltd.*, 2015 IL App (1st) 131883, ¶ 23).

¶ 22        The appellate court majority determined that Helix did not base its alleged lost profits on actual sales of another entity operating a comparable business. *Id.* ¶ 46.

Instead, Helix only compared its product to the NAA lease, while insisting that that lease was vastly different. *Id.* From the outset, Helix intended to create a new product " 'with many unique qualities' " as an alternative to the NAA lease. *Id.* Moreover, at his deposition, Ivey testified that the Helix leases not only differed from the NAA lease concerning the products' characteristics but also amounted to " 'a different animal in a lot of ways,' " including the TURSS platform on which the leases would be sold. *Id.* ¶ 47. The majority discussed *Milex Products, Inc. v. Alra Laboratories, Inc.*, 237 Ill. App. 3d 177 (1992), upon which Helix primarily relied, at length. The majority found that the lost profit analysis in this case differed inherently from that in *Milex Products*, "[i]n light of the undisputed facts regarding the differences between the NAA and Helix lease products." 2021 IL App (1st) 200894, ¶ 48.

¶ 23　　The appellate court majority rejected Helix's argument that it was not a new business because Ivey had been involved in creating lease products for years before he launched Helix. *Id.* ¶ 52. The majority maintained that "the new business rule has nothing to do with the date of a company's launch; it applies unless a company can present evidence of past, actual profits from which to assess estimates of alleged lost profits." *Id.* (citing *Kinesoft Development Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 909 (N.D. Ill. 2001)).

¶ 24　　Justice Walker dissented. He believed that the standard set by the majority interpreted the exceptions to the new business rule too narrowly, thereby shielding too much misconduct from liability. *Id.* ¶ 83 (Walker, J., dissenting). According to Justice Walker, an expert's report on the market, supported by sufficient data concerning comparable products, may support an award of damages for an unmarketed product. *Id.* ¶ 86. Justice Walker reviewed the reports of Cohen and Smith and found that they sufficiently supported Helix's claim for lost profits. *Id.* ¶ 90.

¶ 25　　This court allowed Helix's petition for leave to appeal. See Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 26 ANALYSIS

¶ 27 As we stated at the outset, the sole issue in this appeal is whether the appellate court erred in affirming the trial court's decision to grant summary judgment to TURSS. Summary judgment motions are governed by section 2-1005 of the Code of Civil Procedure. 735 ILCS 5/2-1005 (West 2018). Under section 2-1005(c), summary judgment should be granted "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.*; *Pielet v. Pielet*, 2012 IL 112064, ¶ 29. Our review is *de novo*. *Jones v. Municipal Employees' Annuity & Benefit Fund of Chicago*, 2016 IL 119618, ¶ 26.

¶ 28 To succeed on a breach of contract claim, a plaintiff must plead and prove (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach. *Babbitt Municipalities, Inc. v. Health Care Service Corp.*, 2016 IL App (1st) 152662, ¶ 27. Here, the only relevant element of that *prima facie* case is damages. In its amended complaint, the damages that Helix sought concerned "the loss of revenues" due to TURSS's failure to sell Helix's products and services through its MySmartMove and CreditRetriever platforms.

¶ 29 A plaintiff pursuing prospective profit damages must establish those damages with " 'reasonable certainty.' " *Tri-G v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 248 (2006) (quoting *Barnett v. Caldwell Furniture Co.*, 277 Ill. 286, 289 (1917)). Reasonable certainty does not mean absolute certainty. *Id.*; see *Belleville Toyota, Inc. v. Toyota Motors Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 361 (2002); *Schatz v. Abbott Laboratories, Inc.*, 51 Ill. 2d 143, 147-48 (1972); see generally Restatement (Second) of Contracts § 352 (1979). The plaintiff must offer competent evidence that tends to establish the lost profits with a fair degree of probability. *Tri-G*, 222 Ill. 2d at 248. Generally, such evidence involves past profits in an established business. *Id.* When the evidence involves expected profits in a new business, there is a concern about conjecture and speculation because the business has yet to show what its profits really are. *Id.* at 249; *Midland Hotel Corp. v. Reuben H. Donnelly Corp.*, 118 Ill. 2d 306, 316 (1987) ("recovery of lost profits cannot be based upon conjecture or sheer speculation").

¶ 30　　　That concern is the basis for the "new business rule." The term "rule" is perhaps imprecise. The new business rule is simply an application of the general principle that a plaintiff alleging breach of contract bears the burden to establish damages with reasonable certainty. See *Malatesta v. Leichter*, 186 Ill. App. 3d 602, 621 (1989). Illinois courts have long held that lost profits may be recovered, but the business must have been established so that the evidence concerning those profits is not speculative. *SK Hand Tool Corp.*, 284 Ill. App. 3d at 427 ("a business that has not been profitable generally will be unable to provide competent proof by which the profits can be estimated with reasonable certainty"); *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 143 Ill. App. 3d 168, 174 (1986); *Rhodes v. Sigler*, 44 Ill. App. 3d 375, 379 (1976); see *TAS Distributing Co. v. Cummins Engine Co.*, 491 F.3d 625, 633 (7th Cir. 2007) (discussing the general rule in Illinois that "expected profits of a new commercial business are considered too uncertain, specific and remote to permit recovery"). Experts may not guess the amount of potential lost profits where there is no historical data to demonstrate their likelihood. *Meriturn Partners*, 2015 IL App (1st) 131883, ¶ 23; see *SK Hand Tool*, 284 Ill. App. 3d at 426 ("Illinois courts have long rejected the use of speculative, inaccurate or false projections of income in the valuation of a business").

¶ 31　　　Of course, evidence of past profits is not the *sine qua non* of proving damages (*Schatz*, 51 Ill. 2d at 147), and "[t]here is no inviolate rule that a new business can *never* prove lost profits" (emphasis in original) (*Tri-G*, 222 Ill. 2d at 249). The appellate court majority and dissent referred to exceptions to the "new business rule." 2021 IL App (1st) 200894, ¶ 49; *id.* ¶ 84 (Walker, J., dissenting). A more helpful way to phrase that point is that there are circumstances when the general principle animating the "rule" does not apply. See *Tri-G*, 222 Ill. 2d at 249. In *Midland Hotel*, 118 Ill. 2d at 316, we quoted the Massachusetts Supreme Judicial Court, and that passage remains instructive: "The nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts." *Lowrie v. Castle*, 113 N.E. 206, 210 (Mass. 1916). If a business, old or new, presents evidence to support that inference, it may recover. No factors guide the analysis; rather, it is a fact-intensive inquiry that differs from case to case.

¶ 32　　　Both parties direct our attention to *Milex Products*. There, Milex Products, an infertility treatment manufacturer, learned that a patent on a brand-name medication

to induce ovulation was expiring and sought to market a generic medication with the same active ingredient. *Milex Products*, 237 Ill. App. 3d at 179. Milex Products and Alra Laboratories, a drug manufacturer, entered an exclusive contract to produce the generic medication. *Id.* at 180. When negotiations between the parties over the price of the medication reached an impasse, Milex Products filed a breach of contract complaint against Alra Laboratories. *Id.* at 179-80. After a bench trial at which Milex Products presented expert testimony regarding its lost profits, the trial court entered judgment in the company's favor. *Id.* at 187. Alra Laboratories appealed. *Id.*

¶ 33    The appellate court affirmed the trial court's judgment. *Id.* at 183. The appellate court recited the familiar principle that lost profits are recoverable "if proved with reasonable certainty." *Id.* at 190. The court added, "The long-standing rule in Illinois is that lost profits may be a measure of damages where a business is interrupted, but the business must have been established prior to the interruption so that the evidence of lost profits is not speculative." *Id.* at 191 (citing *Drs. Sellke & Conlon*, 143 Ill. App. 3d at 174). According to the appellate court, the reasoning behind that rule is "the lack of certainty in showing lost profits for a new business that has yet to show what its profits actually are." *Id.* The appellate court, however, found that that rule did not fit the circumstances of the case before it. *Id.* at 192. While the generic medication may have been a new one, "the evidence showed it to have an established market." *Id.* at 193. The appellate court concluded that Milex Products' proof of lost profits was not speculative but instead was reasonably certain. *Id.;* see also *Antrim Pharmaceuticals LLC v. Bio-Pharm, Inc.*, 310 F. Supp. 3d 934, 946 (N.D. Ill. 2018) (holding that the generic pharmaceutical manufacturer plaintiff "offered evidence sufficient to establish a lost profits estimate with 'a reasonable degree of certainty' " though expert testimony that was "quite similar" to that in *Milex Products*).

¶ 34    Unlike the generic medication in *Milex Products*, Helix's lease was not a copy of an existing product. Though Ivey insisted that providing lease content was not a new business for him, he testified in his deposition about enthusiasm for conversations with Britti about "repackaging" TURSS's screening data and creating "new products." Ivey described Helix's "unique lease system" that was "designed specifically for integration into an electronic software operating platform." Helix's products and services would serve as "the backbone to integrate

the entire lease process," making it the "the highest quality national product in existence" with "many unique qualities." Cohen described Helix's lease as far superior to any competing lease and called it "the perfect product at the perfect time." In contrast, the NAA lease was "flawed and inferior." Cohen echoed Ivey's sentiment that Helix's lease was "of the highest quality in the industry."

¶ 35        Ivey testified in his deposition that Helix's lease was "a different animal in a lot of ways" from a standard lease drafted by a law firm. According to Ivey, there were "no high quality lease products" that were integrated into electronic platforms. Ivey detailed other "significant deficiencies" in the NAA lease and highlighted the "differences" in the Helix lease. The Helix lease offered improvements and enhancements on the industry-leading product, including the removal of a "poison pill" provision detrimental to landlords. The Helix lease was shorter and more readable than the NAA lease. The Helix lease was customizable to suit the "unique needs" of landlords. And the Helix lease would have been offered on a platform with tenant screening and other services. As Ivey summarized his sales pitch to the industry, Helix was doing a product with TURSS on a "new platform."

¶ 36        Further, unlike the generic medication in *Milex Products*, Helix's lease did not have an established market. Ivey stated that service providers to the residential leasing industry were "behind the national products curve in several important ways" because existing platforms "were limited and did not integrate the entire lease process." Ivey testified in his deposition that he was aware of "gaps in the market for a quality lease product," as well as "a market demand for a different product." Ivey continued, "[A]s someone who tries to be creative, I said good grief, we could do this better." Ivey hoped to fill the void for those "missing products and services." Cohen agreed that "there was a large market for a good residential lease and related forms product" when the parties entered the marketing agreement, intimating both that the NAA lease was not a good product and that it did not meet the market's demand.

¶ 37        Helix also contends that *Tri-G* and *Malatesta* held that new businesses may seek recovery of prospective profits "without evidence of prior profits." Helix misreads those cases. In *Tri-G*, 222 Ill. 2d at 249, the construction company plaintiff's lost profits claim was supported by testimony from another construction company's principal, who had spent years in the same business and had built

comparable houses for comparable prices in the same subdivision. In *Malatesta*, 186 Ill. App. 3d at 622, the car dealership purchaser plaintiff's lost profits claim was supported by evidence of the profits of a dealership at the same location. See also *Fishman v. Estate of Wirtz*, 807 F.2d 520, 552 (7th Cir. 1986) (holding that evidence of a professional basketball franchise's past profits was "an exceptionally helpful guide" in calculating the damages for a company that unsuccessfully attempted to buy the franchise). Those cases are nothing like this case. Simply put, Helix did not present evidence of revenues of a similar product or a similar business in a similar market. TURSS correctly observes that "where a plaintiff seeks lost profits for a new company, without a track record of profit, attempting to sell a new and untested product to a new market," the specter of impermissible speculation arises. See *TAS Distributing*, 491 F.3d at 635 (stating that sales of an "inherently different" product renders comparison with the plaintiff's product "somewhat speculative" and "counsels extreme caution" in relying on such a comparison in measuring lost profits).

¶ 38     In the absence of a genuine issue of material fact as to lost profits, TURSS was entitled to judgment as a matter of law. The appellate court did not err in affirming the trial court's summary judgment in favor of TURSS.

¶ 39                               CONCLUSION

¶ 40     For the reasons that we have stated, we affirm the judgment of the appellate court.

¶ 41     Affirmed.

¶ 42     JUSTICE OVERSTREET, dissenting:

¶ 43     I respectfully dissent from the majority's conclusion that Helix did not present evidence of lost profits sufficient to withstand summary judgment and allow its breach of contract claim to go to the jury. In making this conclusion, the majority compares Helix's evidence to the evidence presented in two appellate decisions and one decision of this court, all of which found sufficient evidence to support a lost

profits award under the facts presented in those cases. See *Milex Products, Inc. v. Alra Laboratories, Inc.*, 237 Ill. App. 3d 177, 193 (1992) (finding evidence sufficient to support lost profits award for new product where evidence was presented using a generic version of the product in a similar market); *Malatesta v. Leichter*, 186 Ill. App. 3d 602, 622 (1989) (finding evidence sufficient to support lost profits award for car dealership where evidence showed prior profits of car dealership in same location); see also *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 249 (2006) (evidence sufficient to support lost profits for new business where evidence was presented as to the same business that had built comparable houses for comparable prices in the same subdivision). The majority concludes that, because the tendered evidence did not concern "a similar product or a similar business in a similar market," it is insufficient evidence of lost profits as a matter of law. *Supra* ¶ 37. Assuming that the evidence of the "comparable" product in this case was in fact dissimilar to Helix's product, I disagree with the majority's assessment.

¶ 44          The majority's conclusion stems from the following proposition. Because the evidence in those cases was found sufficient to sustain an award of lost profits damages after a trial, and the evidence in this case is of a different character than the evidence in those cases (the product or business is not "as similar"), it follows that the evidence in this case is insufficient as a matter of law to be submitted to a trier of fact. The fallacy in this analysis is that it assumes a false equivalency. There is an essential difference between those cases analyzed by the majority and the case at bar.

¶ 45          The prior decisions cited by the majority reviewed the sufficiency of the evidence submitted at trial to determine whether that evidence supported the fact finder's award. *Milex Products, Inc.*, 237 Ill. App. 3d at 179 (lost profits awarded following a bench trial); *Malatesta*, 186 Ill. App. 3d at 620 (lost profits awarded following a jury trial); *Tri-G, Inc.*, 222 Ill. 2d at 247-48 (lost profits awarded following a jury trial). Here, the question is whether the evidence was sufficient to present a genuine issue of material fact sufficient to submit the evidence to the trier of fact for a determination of lost profits. This question requires the court to determine not whether Helix is able to prove lost profit damages but whether TURSS has affirmatively disproven such damages. See *Hutchcraft v. Independent Mechanical Industries, Inc.*, 312 Ill. App. 3d 351, 355 (2000) (citing 4 Richard A.

Michael, Illinois Practice, § 40.3, at 271-72 (1st ed. 1989) (Civil Procedure Before Trial)). Moreover, the determination of damages is typically a question of fact for the jury. *Snover v. McGraw*, 172 Ill. 2d 438, 447 (1996).

¶ 46     Section 352 of the Restatement (Second) of Contracts (1979) provides that "[d]amages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." While that section of the Restatement has not yet been adopted by this court, the majority cites it for the general proposition that reasonable certainty is not the same as absolute certainty. *Supra* ¶ 29. However, the majority does not acknowledge the comments to that section, which suggest that summary judgment is not appropriate here. Those comments, in fact, make clear that a determination of whether lost profits for a new business are proven with reasonable certainty should be a fact question, especially where there is evidence of willful breach:

> "Doubts are generally resolved against the party in breach. A party who, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred. A court may take in account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts. Damages need not be calculable with mathematical accuracy and are often at best approximate. \*\*\* Furthermore, *increasing receptiveness on the part of courts to proof by sophisticated economic and financial data and by expert opinion has made it easier to meet the requirement of certainty*." (Emphasis added.) Restatement (Second) of Contracts § 352 cmt. a, at 144-45 (1979).

¶ 47     I believe the courts of Illinois should follow this trend. Comment b to this section of the Restatement reiterates the varying nature of potential proof of lost profits for a new business, recognizing that proof is more difficult but stating that, "[n]evertheless, damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." *Id.* cmt. b, at 146. There is nothing in the language of the Restatement or its commentary that requires proof of market data surrounding an identical product, or even a "similar" product, to survive summary judgment.

¶ 48　　I believe this section of the Restatement (Second) of Contracts and its commentary bring the "new business rule" in Illinois in line with advances in economic data analysis. In addition, application of the principles set forth in the comments to this Restatement strikes the appropriate balance between the twin goals of certainty in damages and discouraging breaches of contract. In so doing, the trier of fact is charged with giving appropriate weight to the evidence after it is subjected to adversarial testing. Thus, I would adopt section 352 of the Restatement (Second) of Contracts as the law in Illinois. See *Tilschner v. Spangler*, 409 Ill. App. 3d 988, 993-94 (2011) (a restatement is binding on Illinois courts only if it is adopted by our supreme court; otherwise it is persuasive authority).

¶ 49　　Applying the principles set forth in section 352 of the Restatement (Second) of Contracts, I find the circuit court erred in granting TURSS's motion for summary judgment. The evidence put forward by Helix is of the nature contemplated by that section, which can be subject to adversarial testing by the fact finder, who would consider all the evidence, including the circumstances of any breach of the contract, to determine whether a reasonably certain damages award is supported by that evidence. Thus, I would reverse the decisions of the appellate and circuit courts and remand for further proceedings. For these reasons, I respectfully dissent.