THOMAS A. REYNOLDS, JR., Plaintiff-Appellee, v. JOHN B. COLEMAN, Defendant-Appellant (Kenneth G. Pigott, Defendant-Appellee).

First District (1st Division)   No. 86—2035

Opinion filed August 1, 1988.

Foran, Wiss & Schultz, of Chicago (Thomas A. Foran, Kenneth W. Sullivan, and Christine S. McGoey, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Craig M. White and Dorothy A. Denniston, of counsel), for appellee Thomas A. Reynolds, Jr.

Patrick T. Driscoll, Jr., P.C., of Chicago, for appellee Kenneth G. Pigott.

JUSTICE BUCKLEY delivered the opinion of the court:

The present dispute arises out of a partnership agreement between John Coleman (Coleman), the defendant, and his former attorneys Thomas A. Reynolds, Jr. (Reynolds), the plaintiff, and Kenneth G. Pigott (Pigott), a nominal defendant, relating to the Whitehall Hotel (Whitehall) located at 105 and 111 East Delaware Place in Chicago. After a bench trial, the trial court awarded Reynolds and Pigott each $953,465 for their respective shares in the partnership, and Coleman appeals, challenging the court's construction of the partnership and its valuation of the partnership assets. For the following reasons, we reverse and remand.

The testimony and exhibits at trial reveal the following. In 1970, Coleman sought to purchase the Whitehall and develop it into a small luxury hotel. To finance his acquisition, Coleman entered into an agreement with Lex Hotels, an English corporation, in 1972, wherein Coleman would supply $6 million to fund the purchase and renovation of the Whitehall, while Lex would renovate and operate the hotel while paying $660,000-per-year rent to Coleman. Reynolds and Pigott, attorneys with the firm Winston & Strawn, provided legal assistance to Coleman in concluding this deal.

Pursuant to the terms of the agreement with Lex, Coleman obtained the $6 million in interim financing from the First National Bank of Chicago, and in December 1972, he purchased the Whitehall for $2,300,000. Legal title to the real estate was held by La Salle National Bank land trust No. 41500 with Coleman as the sole beneficiary.

Lex, as the tenant, paid rent to the trust.

In the latter part of 1973, Coleman purchased the Putnam Building immediately adjacent to the Whitehall and transferred its title into the Whitehall land trust. Coleman then renegotiated his agreement with Lex, with the assistance of Pigott, to incorporate the Putnam Building into Lex's renovation program. Under the amended agreement, Lex's rent was increased to $1,100,000 per year, and Coleman agreed to provide the additional funds necessary for the extra renovations.

Subsequently, Coleman, Reynolds and Pigott entered into an agreement, memorialized in a letter dated March 4, 1975, confirming a prior oral agreement, "concerning [the] ownership, operation and management of The Whitehall" defined as "the real estate commonly known as 105 and 111 East Delaware Place, Chicago, Illinois." The letter, drafted by Reynolds, indicated that Coleman retained a 95% interest in the Whitehall while Reynolds and Pigott each held 2½% interests in the hotel. The letter further recognized that title to the land was held in land trust No. 41500 with La Salle National Bank acting as trustee.

Lex began operating the Whitehall as a luxury hotel in June 1974, and continued to do so until October 31, 1980, at which time Coleman purchased the operations, leasehold and fixtures of the hotel through his wholly owned corporation, W. M. Management Company, for approximately $2.2 million.

On March 30, 1984, Coleman entered into a complex financial arrangement structured by Integrated Resources, Inc., a publicly held financial services company, with Whitemont Associates Limited Partnership (Whitemont) to raise cash towards the operations of the Whitehall and Tremont Hotel, another hotel owned by Coleman. The deal was characterized as a "sale" even though Coleman retained the right to manage the hotels and use their assets as collateral for future loans. He also remained obligated to pay all expenses, taxes, repairs, improvements and maintenance for the hotels, thus merely conveying their legal titles to Whitemont. The stated "purchase price" for the hotels under the transaction, based on an appraisal obtained from the firm of Cushman & Wakefield, was $70 million, 60% or $42 million allocable to the Whitehall and 40% or $28 million allocable to the Tremont. Coleman actually received for the Whitehall $38.64 million in purchase money notes and $9.66 million in cash, $6.3 million of which was prepayment interest on the Whitehall notes.

With the conveyance of the legal titles, Whitemont sold shares in the hotels to a syndicate of limited partners. The confidential offering

memorandum for potential investors stated:

"it is not expected that there will be any cash available for distribution to the Partners until after March 30, 1999 ***. As such, an investment in the Partnership would not be suitable for an investor seeking early cash distributions."

The return on a limited partner's investment came in the form of substantial tax losses. During the 15-year period, the limited partners could expect a tax loss at a ratio of $3.5 to $1 invested.

The trial court considered the Whitemont transaction as well as the testimony of five witnesses in arriving at its valuation of the partnership. Coleman submitted the testimony of William A. McCann and Neil King, who are both professional real estate appraisers and licensed real estate brokers.

King and McCann testified that three recognized appraisal methods, the comparable sales approach, the economic or income approach, and the replacement or reproduction cost method, are taken into consideration in determining the fair market value of real estate. Under the comparable sales approach, the appraiser considers the sale price of similar properties to derive a unit for comparison which can be applied to the appraisal property. In the case of hotels, the appraiser attempts to derive a price-per-room unit of comparison by dividing the gross sales price of a comparable hotel by the number of rooms in a facility. A comparable hotel is one that is reasonably similar in location, use, physical construction and income production to the hotel subject to appraisal.

The economic or income approach requires the appraiser to multiply the actual fair rental value of the property by a reasonable capitalization rate to arrive at the total value for the property. The capitalization rate reflects the percentage rate of return an investor in the marketplace would expect to receive from the real estate.

Finally, under the reproduction approach, an appraiser adds the value of the land underlying the building to the cost to replace or reproduce the structure, plus or minus any accrued depreciation or appreciation. This appraisal method generally sets the high end of value for a property because the market assumes that a purchaser would not pay more for a used facility than he would to buy it new.

To give an appraisal of the Whitehall, McCann and King both visited the hotel and thoroughly inspected it. Their inspection revealed that the hotel is situated on a parcel of land that is approximately 18,266 square feet, about a half-block west of Michigan Avenue on the south side of Delaware Street in Chicago. Other hotels in the vicinity of the Whitehall include the Drake, the Mayfair Regent, the Ritz Carl-

ton and the Inn of Chicago.

The Whitehall building itself is a 21-story, reinforced concrete structure with a face-brick finish built around 1928. The basement houses the original heating equipment, the boilers, and a laundry facility used for the hotel operations. On the first floor of the hotel is a 125-seat restaurant called "The Whitehall Club" which is operated as a private club as well as open to hotel guests. This floor also has a small lobby with a bar. Three elevators, two passenger and one freight, lead to the upper floors, which contain approximately 223 guest rooms, including several suites on the top floors. The hotel structure is attached to the Putnam Building, a five-story complex used primarily for office space. A portion of the Whitehall Club extends into this building.

There is no parking available for guests of the Whitehall. Rather, the area behind the hotel is primarily used for commercial loading and unloading. This back parcel has no value to anyone other than the owner of the Whitehall or Tremont for expansion of those facilities.

King and McCann initially testified as to the value of the Whitehall real estate separate from the business of the hotel. After considering both the income and reproduction income approaches, King obtained fair market values of the real estate of $13 million and $17 million. King arrived at the $17 million reproduction figure by calculating the cost of the land underlying the Whitehall to be worth $5 million using a $250- to $300-per-square-foot rate. He then estimated the cost of replacing the building to be $115 per square foot times the 140,000-square-foot area of the building for a total of $16 million. He added these two figures together and reduced the $21 million total by 25% for physical depreciation and functional obsolescence, resulting in $17 million.

In arriving at the $13 million income figure, King capitalized the $1.1 million-per-year rental income generated by the Lex lease by 9%, arriving at a total income of $12.2 million. He raised this $12.2 million to $13 million to account for the potential payment of "profit rent" as stated in the lease.

McCann valued the Whitehall, excluding the hotel business, between $11.9 and $20 million. He used reproduction cost figures similar to those of King to arrive at his $20 million total reproduction cost estimate. In arriving at the $11.9 million figure under the income approach, he utilized a capitalization rate of 11% on the Lex rent and depreciated the total value to account for the age and condition of the building.

In determining the equity value of Pigott's and Reynolds's 2½%

interests, King and McCann first reduced their ultimate fair market appraisals of $13 million and $11.9 million of the hotel, respectively, by subtracting the debt encumbering the Whitehall. They then added 5% of these resulting equity amounts to 5% of the net cash flow due under the Lex lease to arrive at $300,833 and $392,359. Thus, one-half of these amounts, representing 2½% of the net real estate in the trust, was $150,416 according to King, and $196,179 under McCann's estimation.

King and McCann also testified to the value as of March 30, 1984, of the land, building and business of the Whitehall, using comparable sales of such hotels as the Drake, Mayfair Regent, Ritz Carlton and the Inn of Chicago, all of which, as noted earlier, are in the vicinity of the Whitehall. Specifically, King stated that the building and business of the Drake Hotel was sold in 1979, for a total cash consideration of $27.7 million, and that at the time of the sale the Drake was better appointed than the Whitehall as it had 657 rooms, three restaurants, and several shops. King calculated the per-room price of the Drake to be $42,279. King also testified that the land, building and business of the Mayfair Regent Hotel, a building similar in age to the Whitehall, was sold for $6.2 million that same year. The Mayfair Regent's per-room price was $26,700.

King further asserted that a 25% interest in the Ritz Carlton Hotel, which commands the highest hotel and occupancy rates in Chicago, was sold for $3.25 million in 1977. It had 450 rooms at the time, as well as a health club, ballrooms, an elegant dining room, a large lobby and a coffee shop. On a per-room basis the price paid for the 25% interest was $28,800.

In addition, King and McCann both testified that the Inn of Chicago was sold in 1985 for $20 million in cash and cash equivalent. The Inn is a 21-story building with 350 rooms and a restaurant on the first floor. When considered on a per-room basis, the price of the Inn in 1985 was $57,000.

In light of these comparable sales, King concluded that the land, building and business of the Whitehall was worth $18 million with a per-room value of $80,717, while McCann valued the Whitehall at $17 million with a per-room value of $76,233. After subtracting the Whitehall's outstanding debts, King's total equity valuation was $4.84 million and McCann's was $3.84 million. Five percent of each of those equity interests in turn is $242,180 and $192,180, respectively. Subtracting 5% of the business losses of the Whitehall from October 1980 to October 1984 from those figures left King with a valuation of $115,006 and McCann with a figure of $65,006, each representing a

5% net equity interest in the land, building and business of the Whitehall.

John Lynch, Richard Hanson and Stephen Mintz testified on behalf of Reynolds as to the fair market value of the Whitehall's land, building and business as of March 30, 1984. Lynch, a senior appraiser with Cushman & Wakefield, testified, as did King and McCann, that the three recognized methods in determining fair market value are the income approach, the reproduction approach, and the comparable sales approach. Lynch further agreed with King that the Drake, Mayfair Regent and the Ritz Carlton directly compete with the Whitehall and were listed as its primary competition in Cushman & Wakefield's appraisal report. In addition, he stated that the appraisal was produced for Integrated Resources in connection with the Whitemont syndication, which he understood to be a tax shelter.

Lynch valued the Whitehall building and business at $45.5 million. He arrived at this figure on the basis of 15-year income and future value projections done by Laventhol & Horwath and Cushman & Wakefield, as well as on a comparable sales survey done by Cushman. Specifically, Cushman projected that the Whitehall building would be worth about $100 million at the end of 15 years. Reducing this figure to present value resulted in $17.1 million. After adding to this amount $28.4 million representing the projected current value of the Whitehall's business income over 15 years, a $45.5 million valuation was produced. Later, Lynch added $3.5 million to this valuation for the Whitehall land, resulting in a total of $49 million.

On cross-examination, however, Lynch testified his valuation was based upon a projection of income before debt. The projection did not deduct the substantial principal and interest payments that Whitemont had to pay out of income during the same 15-year period. Lynch conceded that the income during the period would not be sufficient to pay even the interest on the $38 million debt attributable to the Whitehall through the Whitemont syndication.

To check his $49 million valuation of the Whitehall's land, building and business, which resulted in a $219,713 per-room cost, Lynch applied the comparable sales approach. He testified that the 306-room Denver Hilton, built in 1981, was sold in 1983 for $24.2 million or $79,000 per room. On cross-examination, Lynch conceded that at $79,000 per room, the Whitehall's value would be $17.6 million.

Lynch also cited the Shoreham Hotel in Washington, D.C., in this regard. The Shoreham was sold in 1983 for $62.5 million or $71,839 per room. Its property consists of 770 rooms, two restaurants, two lounges, two swimming pools, two tennis courts, and is situated on

9.6 acres. Again, Lynch admitted that at $71,839 per room, the Whitehall had a value of $16.2 million.

Lynch used the sale of four other hotels as comparable to the Whitehall, including the Boca Raton Hotel and Club in Boca Raton, Florida, the Four Seasons Clift in San Francisco, California, the Hay Adams Hotel in Washington, D.C., and the Newporter Inn in Newport Beach, California, each of which is better appointed and yet sold for far less on a per-room basis than the Whitehall. Moreover, Lynch acknowledged that, on a per-room basis, the Drake was sold in 1979 for one-fifth the value he placed on the Whitehall, and the Mayfair Regent was sold in 1979 for one-eighth of his Whitehall valuation.

Richard Hanson, an accountant and president of Stein & Company, a Chicago-based real estate developer, also testified for Reynolds as to the fair market value of the Whitehall. Coleman objected to Hanson's testimony on the ground that he never inspected the Whitehall for purposes of an appraisal, and that he was neither a qualified real estate appraiser nor was involved in producing the appraisal report, and therefore was not competent to give an opinion about the value of the hotel. The court overruled this objection, and Hanson testified that the Whitehall had a value of $45.5 million, exclusive of the land, basing his valuation on Cushman & Wakefield's appraisal and his review of Whitemont's syndication report.

Stephen Mintz, first vice-president of Integrated Resources, also expressed an opinion as to the fair market value of the Whitehall, including the land, building and business. He testified that the $42 million "purchase" price paid in connection with the Whitemont transaction represented the fair market value of the Whitehall.

On cross-examination, Mintz described the Whitemont transaction, in effect, as a tax shelter, noting that in order for such a transaction to be treated as a true sale by the Internal Revenue Service (IRS), it must have a "business purpose" apart from acquisition of tax benefits. He stated that if the IRS did not view the transaction as an actual sale, it would subject the general partners to a "bevy of litigation."

At the conclusion of the trial, the court dissolved the partnership between Coleman, Reynolds, and Pigott, holding that the land, building and business of the Whitehall was within its scope. The court found that the Integrated Resources transaction was "a sale" and that the $42 million purchase price established the fair market value of the building and business of the Whitehall. The court valued the land at $6,619,000 for a total gross value of the partnership noncash assets of $48,619,000. After adding cash assets and deducting the

partners' *pro rata* liabilities, the court entered judgment of $953,465 for Reynolds and the same amount for Pigott. Coleman appeals from this judgment.

■■ ■ We initially consider whether the trial court correctly concluded that the scope of the partnership agreement included the land, building and business of the Whitehall. Where terms of an agreement are clear and unambiguous, they will be given their natural and ordinary meanings. (*Wil-Shore Motor Sales, Inc. v. Continental Illinois National Bank & Trust Co.* (1984), 130 Ill. App. 3d 167, 172, 474 N.E.2d 376, 380.) The intent of the parties must be determined from the language of their agreement alone when it is not ambiguous. (*Berutti v. Dierks Foods, Inc.* (1986), 145 Ill. App. 3d 931, 934, 496 N.E.2d 350, 352.) Language in a contract is not rendered ambiguous simply because the parties do not agree upon its meaning. *Harris v. American General Finance Corp.* (1977), 54 Ill. App. 3d 835, 839, 368 N.E.2d 1099, 1103.

In our view, the partnership agreement is unambiguous and clearly sets forth the scope of the partnership. The March 4, 1975, letter memorializing the terms of the parties' agreement states in the first sentence that it concerns the "ownership, operation and management of The Whitehall." It further defines the Whitehall as the "real estate" located at 105 and 111 East Delaware Place, the legal title of which is held in a land trust with Coleman holding a 95% beneficial interest, and Reynolds and Pigott each holding 2½% beneficial interests. There is no mention in the letter that the business of the Whitehall is to be included within the partnership agreement.

Reynolds and Pigott argue, however, that certain extrinsic evidence demonstrates that the scope of the partnership also included the hotel business. It is well established, however, that extrinsic evidence will only be considered to construe ambiguities in an agreement. (*Rakowski v. Lucente* (1984), 104 Ill. 2d 317, 323, 472 N.E.2d 791, 794.) Given our conclusion that the agreement is unambiguous, there is no need to resort to extrinsic evidence.

Assuming, *arguendo,* that the agreement was ambiguous, the ambiguities must nevertheless be construed against Reynolds, the plaintiff, because he drafted it. (*Dr. Charles W. Smith III, Ltd. v. Connecticut General Life Insurance Co.* (1984), 122 Ill. App. 3d 725, 728, 462 N.E.2d 604, 606.) Moreover, the extrinsic evidence that Reynolds and Pigott rely on does not support their position. Specifically, Reynolds and Pigott argue that the tax returns for the partnership filed by Coleman claimed deductions for the real estate and the business of the Whitehall, raising the inference that the business was part of the

partnership. Our examination of these returns discloses that the partnership merely took deductions for physical depreciation and mortgage interest, and did not take any deductions for business operations associated with the hotel. Indeed, the tax returns all state that real estate is the activity of the partnership. Thus, the proper inference to be drawn from these returns is that the partnership only included the real estate of the Whitehall.

Furthermore, Coleman himself presented undisputed extrinsic evidence that the partnership did not include the hotel business. In October 1980, his wholly owned corporation, W. H. Management Company, paid Lex Hotels approximately $2.2 million for the business of the hotel. Clearly, Coleman would not pay in excess of $2 million for a business the partnership already owned.

Thus, the express terms of the agreement and the extrinsic evidence discussed above all demonstrate that the scope of the partnership only included the land and building, and not the business of the Whitehall. The trial court's conclusion that the partnership included the business of the hotel, therefore, is against the manifest weight of the evidence (*Schroeder v. Meier-Templeton Associates, Inc.* (1984), 130 Ill. App. 3d 554, 559, 474 N.E.2d 744, 749) and must be reversed.

■ In addition to erroneously construing the scope of the partnership, the trial court improperly valuated the Whitehall's worth. The fair market value of property is the amount of money which a purchaser, willing but not obligated to buy the property, would pay an owner, willing but not obligated to sell the property (*People ex rel. Department of Transportation v. Birger* (1987), 155 Ill. App. 3d 130, 134, 507 N.E.2d 1321, 1324; *Department of Business & Economic Development v. Pioneer Trust & Savings Bank* (1976), 39 Ill. App. 3d 8, 10, 349 N.E.2d 467, 470), "and no account should be taken of values or necessities peculiar to either party" (*People ex rel. Korzen v. Belt Ry. Co.* (1967), 37 Ill. 2d 158, 164, 226 N.E.2d 265, 268). The concept may be proven by an actual sale of the property, or by sales of properties that are reasonably comparable in locality, quality, character and usefulness to the valued property, so long as they are made freely in an open market. (*Forest Preserve District v. Krol* (1957), 12 Ill. 2d 139, 148, 145 N.E.2d 599, 604; *Morton Grove Park District v. American National Bank & Trust Co.* (1976), 39 Ill. App. 3d 426, 436, 350 N.E.2d 149, 158.) Evidence adduced to establish a sale "must show that the sale was for money, and not wholly or partially for a consideration other than money." *Department of Business & Economic Development v. Baumann* (1974), 56 Ill. 2d 382, 384, 308 N.E.2d 580, 581.

■ Under these principles, the March 30, 1984, transaction was not a "sale" capable of evidencing the fair market value of the Whitehall as a matter of law. The evidence as attested to by Mintz, Lynch, and Hanson, and as contained in Reynolds' exhibits, clearly demonstrates that the March 30 transaction was part of a complex arrangement involving a tax shelter syndication and was not a conveyance of property to a typical purchaser from a typical seller. The transaction was not, therefore, governed by the open market considerations necessary to set fair market value, but instead was governed by the peculiar necessities and requirements of the Whitemont syndication.

Moreover, the $42 million "purchase price" was not a fair market price as it was never intended to be completely paid. As noted earlier, Coleman received a total of $9.66 million in cash, and notes in the face amount of $38.64 million to constitute the rest of the "purchase price" attributable to the Whitehall. The notes were for a 40-year term and were payable with interest only for the first 15 years at 17.5%. The Whitemont offering memorandum stated, however, that "[i]t [was] not expected that the Partnership [would] have sufficient funds available to pay the interest on the PM notes on a current basis during most of the first 15 years," to which Mintz agreed at trial. In fact, Mintz testified that pursuant to the memorandum Coleman could not even foreclose on the notes through 1999, as long as Whitemont paid all "net" cash flow generated by the Whitehall to him and the amount of accrued and unpaid interest on the notes did not exceed in the aggregate an amount equal to the immediately preceding seven years of debt service thereon. Since no net cash flow was anticipated for these years, Coleman did not have a true right of foreclosure, and accordingly, the notes evidence no real obligation on the part of Whitemont.

Furthermore, the valuation accepted by the trial court was based, in part, upon admittedly speculative projections of the Whitehall's future income. Not only did Laventhol & Horwath report such income might never be "achieved" but also Whitemont's offering memorandum cautioned that the projections upon which it relied might not "be realized in fact" and that "projections of net cash flow from an operating property, such as the Hotels, are inherently subject to judgments of unpredictable events (such as occupancy rates, market room rates, the rate of inflation and economic conditions prevailing generally and in the area in which the Hotels are located) and, for that reason, the accuracy of such projections cannot be assured."

This valuation method was specifically rejected by our supreme court in *People v. Stevens* (1934), 358 Ill. 391, 193 N.E. 154, where

the People attempted to prove the value of the Stevens Hotel by calculating the income from the projected occupancy of the hotel over a 35-year period and adding that income to the projected value of the hotel reduced to its present day value. In reaching its conclusion, the court stated:

"[T]he testimony of the People's witnesses concerning the value of the assets of the hotel company was incompetent. In civil cases the rule is that fair cash market value of property on the date under inquiry is its value for the highest and best use for which it is adapted, and evidence tending to show profits from the operation or volume of business, or contingencies of future profits, is too speculative and remote to be considered." (358 Ill. at 406, 193 N.E. at 160.)

Likewise, the projections here were "too speculative and remote" to be considered in determining the fair market value of the Whitehall.

In addition, the projections themselves were proven inaccurate and false. On cross-examination, Lynch stated that the income projections were based on net income before debt and that they would not be sufficient to pay even the interest on Whitemont's debt to Coleman until 1996. In so testifying, Lynch established that there was nothing which legitimately could be added to Cushman & Wakefield's projection-based $17.1 million value of the Whitehall building, to reach its resulting $45.5 million figure. Further, Mintz admitted during cross-examination that at the time Whitemont prepared its offering memorandum, the projections of income included therein upon which the "purchase price" was based had already been proven to be substantially in excess of the hotel's actual income. The projections were also premised on the faulty assumption that Chicago would host the World's Fair in 1992.

■ Rather, the only competent evidence of land value was elicited from Coleman's experts King and McCann. Among other methods, they properly compared the Whitehall with the sales of the Chicago-area Drake, Mayfair Regent, Ritz Carlton and Inn of Chicago hotels which, with the exception of the Inn, had been identified as the Whitehall's primary competition by the Whitemont offering memorandum, Lynch, and the Cushman appraisal. Although Cushman & Wakefield compared the Whitehall to hotels which were generally larger and better equipped, situated on bigger pieces of land, and far more famous and luxurious, the sales prices of even these hotels established that Cushman & Wakefield had greatly overvalued the Whitehall and that its value was within the range of King's and McCann's appraisals. Since the trial court's finding was against the manifest weight of

the evidence, we remand the cause for a revaluation of the real estate of the Whitehall.

We note that Reynolds and Pigott filed a motion, taken with the case, to dismiss this appeal for defendant's failure to post bond for costs pursuant to Supreme Court Rule 364 (73 Ill. 2d R. 364), alleging that Coleman is not a resident of Illinois. This court may waive the posting of any security on appeal where an appellant appears to have a meritorious cause. (*Central National Bank v. Baime* (1982), 112 Ill. App. 3d 664, 670, 445 N.E.2d 1179, 1184.) In light of the facts in this case and the substantive conclusions drawn therefrom, the requirement that bond be posted is hereby waived.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and remanded for further proceedings consistent with this decision.

Reversed and remanded.

CAMPBELL, P.J., and MANNING, J., concur.