FIRST DIVISION 
 OCTOBER 15, 1996








No. 1-94-3997


SK HAND TOOL CORPORATION ) APPEAL FROM THE
and CORCORAN PARTNERS, LTD. ) CIRCUIT COURT
 Plaintiffs-Appellees, ) OF COOK COUNTY.
 Cross-Appellants, )
 )
 v. )
 )
DRESSER INDUSTRIES, INC., ) HONORABLE
 Defendant-Appellant, ) MARTIN C. ASHMAN,
 Cross-Appellee. ) JUDGE PRESIDING.

 PRESIDING JUSTICE CAMPBELL delivered the opinion of the
court:
 Plaintiffs SK Hand Tool Corporation ("SK") and Corcoran
Partners Limited ("Partners") sued defendant Dresser Industries,
Inc. ("Dresser") for fraud in connection with the Partners'
purchase of Dresser's hand tool division. Following a trial in
the circuit court of Cook County, the jury returned a verdict 
for plaintiffs in the amount of four million dollars in compensa-
tory damages and 50 million dollars in punitive damages. The
trial court denied Dresser's post-trial motion, but granted a
remittitur totalling 42 million dollars of the punitive damages. 
Plaintiffs consented to the remittitur. Both sides now appeal.
 The record on appeal indicates that Daniel Czuba and Thomas
Corcoran formed Partners in 1982 to acquire and turn around
troubled companies. The Partners first sought to buy Dresser's
hand tool division.
 Dresser CEO Jack Murphy wanted the sale to close before the
end of the fiscal year on October 31, 1983. The parties signed a
letter of intent on August 16, 1983 and began negotiating a
definitive agreement. Murphy would not sell to the Partners on
credit. According to Rex Sebastian, a former Senior Vice Presi-
dent of Dresser, Murphy also wanted to ensure that the loss to
Dresser would not exceed $1,000,000.
 The sale was closed by a Purchase Agreement ("Agreement")
signed on October 26, 1983. The purchase was a leveraged buy-out
wherein the Partners put up $100,000 cash, pledged their personal
assets and borrowed approximately $7.8 million to purchase the
business. The estimated sale price was discounted by ten million
dollars from book value, reflecting the poor performance and
contingent liabilities of the business. The Partners' interest
was assigned to SK, a wholly-owned subsidiary of the Partners.
 Paragraph 3.2 of the Agreement provided that Dresser war-
ranted an "Effective Date Balance Sheet," prepared from the books
of account of the handtool division in accordance with the
accounting principles, practices and procedures consistently
applied by Dresser with respect to the handtool division. The
Effective Date Balance Sheet was to fairly present in all mater-
ial respects the asset values and liabilities for the items
reflected thereon as of the effective date.
 Paragraph 2.4 of the Agreement provided that Dresser would
have 45 days from the closing date to submit the Effective Date
Balance Sheet to the buyer. Paragraph 2.4 also provided that in
the event of any disagreement with the balance sheet within 60
days after receipt thereof, the parties would make a good-faith
attempt to resolve their differences, with any such resolution
becoming final and binding. If the parties were unable to
resolve their differences within 30 days of Dresser's receipt of
notice from the buyer, the parties would appoint a nationally
recognized accounting firm to arbitrate the dispute.
 In December 1983, Dresser submitted the Effective Date
Balance Sheet, showing that SK owed an additional $28,000 for the
purchase of the handtool division. SK submitted the Effective
Date Balance Sheet to the accounting firm of Peat, Marwick &
Mitchell, which itemized $3.5 million in possible offsets SK
might have against Dresser's calculation of the purchase price. 
SK submitted the list to Dresser, which disputed some of the
claimed offsets. In March 1984, the parties unsuccessfully tried 
to settle their differences. Peat, Marwick & Mitchell later
revised its list to $2.5 million in possible offsets. However,
disagreements between the parties remained.
 On April 25, 1984, the plaintiffs filed a complaint to
compel arbitration in the circuit court of Cook County. Dresser
filed a petition for removal in the United States District Court
for the Northern District of Illinois. Dresser also filed a
three-count countercomplaint for sums Dresser allegedly advanced
to SK to meet certain payroll obligations after the purchase. 
The plaintiffs later added counts alleging common law fraud and
violation of the federal racketeering statutes to its complaint
in federal court. On December 17, 1984, the district court
ordered Dresser to submit the claims relating to the calculation
of the Effective Date Balance Sheet to arbitration; Dresser's
counterclaims were not submitted for arbitration.
 On July 25, 1985, the arbitrator awarded the Partners/SK a
$1,386,000 reduction in the purchase price. In late 1985, SK was
sold to a French entity named Facom. Corcoran and Czuba each
made over two million dollars on the sale.
 On January 29, 1987, the racketeering count was dismissed. 
On July 29, 1987, the federal district court granted judgment on
the arbitration award to the Partners/SK and to Dresser on all
three counts of its countercomplaint. On August 19, 1987, SK and
Dresser executed releases in satisfaction of judgment in the
amount of $1,357,848.18 and interest and $1,456,121.83 and
interest, respectively. In sum, the Partners/SK owed Dresser
approximately $98,000. The trial court granted Dresser's motion
to dismiss the common law fraud claim for lack of jurisdiction.
 Plaintiffs then filed a complaint against Dresser in the
circuit court of Cook County on January 27, 1988. The complaint,
later amended, alleged that officers and agents of Dresser
misrepresented the value of the handtool division's assets and
liabilities. In particular, the plaintiffs claimed that William
Downey, President of the Dresser Tool Group, told them that the
dollar value of "lifts" to which the handtool division was
committed was "practically nothing." Plaintiffs also alleged
that Dresser Tool Group Comptroller John Macaulay falsely told
them that the handtool division's accounting practices differed
from generally accepted accounting principles ("GAAP") only with
respect to intracompany transfers. Plaintiffs also alleged that
Macaulay falsely represented that Dresser's figure for obsolete
inventory would be "proper," when Dresser had removed items from
the list of obsolete inventory that allegedly should have been
included. The complaint further alleged that George Fansmith,
the comptroller for the handtool division, represented that a
liability for cooperative advertising had been accrued, but the
liability was allegedly not reflected in Dresser's balance
sheets, thereby inflating the purchase price. Finally, the
complaint alleged that Dresser's representation that the balance
sheet would fairly present the asset values and liabilities for
the items reflected thereon was false.
 Plaintiffs alleged that they relied on these statements, but
after learning of their falsity were forced to curtail marketing
expenditures, resulting in lost sales and profits and a lower
resale price.
 At trial, Daniel Czuba testified that after the Partners
signed the letter of intent, he and Corcoran and outside advisors
investigated the business. Czuba testified that in late August
1983, he discussed the handtool division's income statement and
the balance sheet with comptroller Fansmith. Czuba testified
that he asked Fansmith what was included in the accrued liabili-
ties, and that Fansmith replied "just the ordinary things, coop
and taxes and all sorts of things that you would expect to find
in an accrual account." Czuba asked whether there was anything
abnormal in the way Dresser kept the books; Fansmith replied that
they "just use conventional accounting." Czuba testified that he
then thought he understood how Dresser would have accounted for
lifts.
 Czuba also testified that he later made several requests to
Fansmith for a breakdown of other accrued liabilities, but was
told that a complete breakdown could not be supplied. Czuba
testified that he did not recall ever asking anybody "flat-out"
whether they made accruals for lift expenditures. 
 Czuba testified about other efforts to determine the amount
of lifts that were authorized but had not "come home to roost." 
Czuba stated that he asked Russ Kennedy, the Vice President of
Marketing for the division, about lifts. Kennedy said that he
did not know and told Czuba to see Bill Downey, President of the
Dresser Tool Group, as the final authority on lifts.
 Czuba testified that in mid-September of 1983, he and
Corcoran asked Downey how many dollars of lifts were in process
or in transit or outstanding. Downey replied "at that point
practically nothing, less than $200,000, and it doesn't matter
anyway because they'll all be flushed through prior to September
30th." Corcoran testified that he and Czuba asked Downey about
the status of "lifts in transit" and were told that they would be
flushed through by September 30th. 
 Downey testified that he told Corcoran and Czuba that as of
the end of July -- the last time he had approved lifts -- the
amount was near one million dollars. However, Downey testified
that he did not believe that it was correct to say that there was
over one million dollars of lifts in transit. 
 Downey testified that he did not tell Corcoran and Czuba how
the division accounted for lifts; rather, he told them that if
they wanted the specific exposure, they should ask the handtool
division. Downey admitted that at the time he spoke to Corcoran
and Czuba, he knew that the lift exposure was not reflected in
the financial statement. Downey also admitted that he knew that
lifts might not be expensed for more than two months after the
account receivable was booked.
 Czuba testified that he had requested a list of excess and
obsolete inventory -- items that are discontinued or faulty in
some way. Czuba testified that his request was referred to
Macaulay, who reviewed a list that had been prepared, but decided
not to provide a copy to the plaintiffs. Macaulay stated that a
list would be prepared consistent with Dresser's policies, that
he did not want to haggle over "nits and gnats," and that the
plaintiffs would have a chance to go over it after the deal
closed, make complaints and get adjustments, if needed.
 Czuba later testified that Macaulay prepared a list of the
inventory, categorizing it as excess, surplus and so on. Czuba
testified that Macaulay later departed from Dresser's policies
for categorizing inventory by adding several obsolete items to
the list of good inventory. One example involved a "pawl," which
is part of a ratchet. According to Czuba, the pawl had been made
of metal which lasted 20 years, but had been changed to being
made out of compressed metal powder, which lasted only two years
on average. Before the Partners purchased the business, the
handtool division discovered the problem and returned to the
metal pawls. Czuba stated that the Partners were charged approx-
imately $35,000 for the compressed metal powder pawls.
 On October 4, 1983, Corcoran and Czuba met with Downey,
Macaulay, and former handtool division President John Reynertson. 
The parties, accompanied by counsel, discussed Dresser's repre-
sentations and warranties regarding its financial statements. 
The Partners had asked Dresser to represent that the financial
statements were prepared in accordance with generally accepted
accounting principles ("GAAP"). Macaulay made a flat statement
that the division statements do not conform with GAAP. Czuba
asked him in what way they did not conform. Macaulay said "well,
for example, in the way we account for intercompany [sic] trans-
actions." Czuba asked if there were other examples. According
to Czuba, Macaulay replied "none that I can think of right now." 
The Partners proposed a representation that the statements were
prepared in conformance with GAAP except for intercompany trans-
actions. Dresser rejected that proposal. Nevertheless, Corcoran
testified that he believed that Dresser's intercompany transfers
were the only deviation from GAAP. 
 Thomas Hunter, one of Dresser's counsels at the meeting,
testified that he had said that he did not believe anyone at
Dresser knew whether the handtool division's accounting practices
complied with GAAP. Macaulay testified that he was not sure
whether he knew how the handtool division accounted for lifts on
October 4, 1983. Downey later testified that Macaulay did know,
but could not say how long Macaulay knew.
 According to Czuba, the parties ultimately agreed on the
language quoted above as paragraph 3.2 of the Agreement.
 The plaintiffs presented two expert witnesses on the issue
of damages. James Moran, a CPA, presented his calculation of the
incremental sales and profits SK would have made if it had spent
more money on the lift program in fiscal year 1984. Moran began
with the plaintiffs' projected marketing capacity expense, then
subtracted the amount actually spent on marketing (after adjust-
ing for various expenses), resulting in a shortfall of lift
removal expenses totalling $1,622,000. Moran further adjusted
the number to account for commissions and other miscellaneous
expenses, resulting in a total shortfall of $1,938,483.
 Moran then assumed that the lift program would have begun in
March 1984 and averaged the shortfall over the seven months
remaining in fiscal year 1984, resulting in a monthly deficit of
$276,926. Moran then used a computer model to identify how this
amount would apply to wholesale and retail sales. Moran also
determined that promotional sales were 25% of ongoing sales. 
Moran used these bases to conclude that plaintiffs lost total
gross incremental sales exceeding four million dollars in 1985.
 Moran then subtracted estimated related expenses, such as
returns, discounts, and freight and volume rebates, along with
other variable expenses such as commissions, display and instal-
lation costs, and interest expenses. Moran arrived at a net
incremental profit for fiscal year 1985 of $1,196,000.
 Chartered Financial Analyst John Borsch testified that he
tried to determine what SK would have been worth when it was sold
to Facom if it had experienced the incremental sales and profits
calculated by Moran. Borsch used two approaches, both of which
compared SK to the Snap-On Tool Corporation ("Snap-On"), which
Borsch opined was the public company most similar to SK. 
 Borsch multiplied the approximately $4.1 million in incre-
mental sales (posited by Moran) by a ratio of 1.38 (Snap-on's
ratio of total revenue to market value), then reduced that figure
by 30% to account for the illiquidity of SK's stock (which is not
publicly traded). These calculations produced a figure of
approximately four million dollars. Borsch performed similar
calculations using the estimated incremental profits, resulting
in a figure of approximately $6.4 million. Thus, Borsch opined
that plaintiffs could have made from four to 6.4 million dollars
more from the sale of SK than what they were paid.
 On cross-examination, Borsch admitted that Snap-On has
independent salesmen who deliver tools directly to the mechanic's
workplace, whereas SK sells to warehouse distributors. Borsch 
did not know whether Snap-On did lifts. Borsch also stated that
Snap-On was the industry leader, a well-run, profitable company.
 Dresser presented two expert witnesses, James Roth and James
Cerone, who presented testimony critical of the data and the
methodologies of Mr. Moran and Mr. Borsch.
 Following closing argument, jury instructions and delibera-
tions, the jury returned a verdict for plaintiffs, awarding four
million dollars in compensatory damages and 50 million dollars in
punitive damages. The trial court denied Dresser's post-trial
motion, but granted a remittitur of 42 million dollars of the
punitive damages. The plaintiffs unsuccessfully sought clarifi-
cation of the scope of the new trial that would be granted absent
their consent. Plaintiffs consented to the remittitur; judgment
was entered on November 1, 1994.
 I.
 On appeal, Dresser maintains that it was entitled to a
judgment notwithstanding the verdict or a new trial on both
liability and damages. A motion for a judgment notwithstanding
the verdict should be entered only when all of the evidence, as
viewed in the light most favorable to the opponent, so overwhelm-
ingly favors the movant that no contrary verdict could ever
stand. (Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494,
511, 229 N.E.2d 504, 513-14 (1967).) In contrast, the decision
to grant or deny a motion for new trial rests within the discre-
tion of the trial court, but may be reversed when the verdict is
against the manifest weight of the evidence. See Villa v. Crown
Cork & Seal Co., 202 Ill. App. 3d 1082, 1089, 560 N.E.2d 969, 973
(1990).
 II.
 Dresser maintains that it is entitled to relief because its
officials and employees made no false statements. Dresser first
claims that there was no false statement as to the amount of
lifts in transit, arguing that there was merely a semantic 
misunderstanding that "lifts in transit" were the same as "out-
standing lifts." Czuba's testimony, however, supports the
conclusion that he asked Downey about outstanding lifts.
 Dresser next contends that there were no false statements
regarding how it accounted for lifts. Dresser points to Czuba's
testimony that he never directly asked Dresser employees how
Dresser accounted for lifts. However, the record shows that
Czuba asked which items were included in the handtool division's
accrued liabilities and was told "just the ordinary things, coop
and taxes and all sorts of things that you would expect to find
in an accrual account." A jury could infer from the testimony
that the credits for the approximately $1.4 million in outstand-
ing lifts were not the sorts of things one would expect to find
in an accrual account.
 Dresser contends that there were no false statements with
respect to whether its accounting complied with GAAP. However,
the trial court did not rely on an affirmative misstatement
regarding GAAP in denying Dresser's post-trial motion. The trial
court's written decision states only that "Dresser's agents knew
that their usual deviations from [GAAP] would cover the scheme."
 In addition, Dresser does not address the alleged misrepre-
sentations regarding obsolete inventory. In sum, Dresser has
not shown that it is entitled to relief on the issue of liabil-
ity, given the record on appeal.
 III.
 Dresser next argues that relief should have been granted
because the damages were based on a speculative calculation of
lost profits. Plaintiffs initially respond that Dresser has
waived this argument because Dresser failed to object to the
introduction of the expert testimony or to the jury instructions
on damages. Plaintiffs, however, failed to raise this argument
in their initial brief, thereby resulting in waiver on appeal.
 Plaintiffs also respond that Dresser confuses operating
profits with gain on the resale of the business. However, the
record clearly shows that plaintiffs' theory was that they would
have made a larger gain on the resale of the business if SK had
not lost incremental sales and profits. Thus, lost profits are
at issue in this case. Moreover, Illinois courts have long
rejected the use of speculative, inaccurate or false projections
of income in the valuation of a business. (People v. Stevens,
358 Ill. 391, 406, 193 N.E. 154, 160 (1934); Reynolds v. Coleman,
173 Ill. App. 3d 585, 596, 527 N.E.2d 897, 904-05 (1988).) Thus,
this court turns to address Dresser's argument.
 Dresser claims that the award is inherently speculative
because the handtool business had a history of unprofitability. 
While there are Illinois cases involving profits lost due to the
interruption of a business, there does not appear to be any case
addressing unprofitable businesses. Accordingly, it may be
helpful to examine the standards for reviewing an award of lost
profits damages in Illinois.
 Generally, the question of damages is one of fact; courts
are reluctant to interfere with the discretion of the jury in its
assessment of damages. (Usselmann v. Jansen, 257 Ill. App. 3d
978, 981, 629 N.E.2d 193, 195 (1994).) This court, however, will
depart from the general rule in a number of situations. See
Usselmann, 257 Ill. App. 3d at 981, 629 N.E.2d at 195; Perry v.
Storzbach, 206 Ill. App. 3d 1065, 1069, 565 N.E.2d 211, 214
(1990).
 In particular, reviewing courts will reverse damage awards
that are based on speculation or conjecture. (E.g., Midland
Hotel Corp. v. Reuben H. Donnelley Corp., 118 Ill. 2d 306, 515
N.E.2d 61 (1987).) Although the amount of an award of lost
profits need not be proven with absolute certainty, the plaintiff
bears the burden of proving such damages with reasonable certain-
ty. (Midland Hotel Corp., 118 Ill. 2d at 316, 515 N.E.2d at 66.) 
Illinois courts have not hesitated to reverse damage awards based
on false assumptions or data as speculative. (See, e.g., Midland
Hotel Corp., 118 Ill. 2d at 317-18, 515 N.E.2d at 67; Reynolds,
173 Ill. App. 3d at 596, 527 N.E.2d at 904-05; F.L. Walz, Inc. v.
Hobart Corp., 157 Ill. App. 3d 334, 340-41, 510 N.E.2d 1248,
1252-53 (1987).) As lost profits are frequently the result of
several intersecting causes, the plaintiff must show with reason-
able certainty that the defendant's conduct caused a specific
portion of the lost profits. (Midland Hotel Corp., 118 Ill. 2d
at 316, 515 N.E.2d at 66.) Illinois courts will hold that an
expert's opinion is based on speculation or conjecture when the
expert fails to account for their party's actions or other
significant factors. (Damron v. Micor Distributing, Ltd., 276
Ill. App. 3d 901, 909, 658 N.E.2d 1318, 1324 (1995)(and cases
cited therein).) A speculative award may be considered erroneous
as a matter of law. See, e.g., Lewis v. Loyola University of
Chicago, 149 Ill. App. 3d 88, 90, 500 N.E.2d 47, 48 (1986).
 Evidence of prior profits is not the sine qua non of proof
of damages suffered by a business in all cases. (See Schatz v.
Abbott Laboratories, Inc., 51 Ill. 2d 143, 147, 281 N.E.2d 323,
325 (1972).) Nevertheless, Illinois courts have long held as a
general rule that while profits lost due to business interruption
or tortious interference with a contract may be recovered, the
business must have been established before the interruption so
that the evidence of lost profits is not speculative. (E.g.,
Green v. Williams, 45 Ill. 206, 209 (1867); Drs. Sellke & Conlon,
Ltd. v. Twin Oaks Realty, Inc., 143 Ill. App. 3d 168, 174, 491
N.E.2d 912, 917 (1986).) The reason for the rule is that a new
business has yet to show what its profits actually are. (Milex
Products, Inc. v. Alra Laboratories, Inc., 237 Ill. App. 3d 177,
191, 603 N.E.2d 1226, 1236 (1992).) However, there are excep-
tions to the general rule. See Milex Products, Inc., 237 Ill.
App. 3d at 192-93, 603 N.E.2d at 1236-37 (and cases cited there-
in).
 The logic of these cases persuades this court that a busi-
ness which has not been profitable generally will be unable to
provide competent proof by which the profits can be estimated
with reasonable certainty. However, as in Milex, there may be
cases in which such proof is adduced at trial. Thus, the ques-
tion remains whether this case falls within the scope of the
general rule, or whether it is an exception.
 The Milex case cited three exceptions in which an award of
lost profits was upheld. (Milex Products, Inc., 237 Ill. App. 3d
at 192, 603 N.E.2d at 1236 (citing Malatesta v. Leichter, 186
Ill. App. 3d 602, 542 N.E.2d 768 (1989); Rhodes v. Sigler, 44
Ill. App. 3d 375, 357 N.E.2d 846 (1976); Fishman v. Estate of
Wirtz, 807 F.2d 520 (7th Cir. 1986)).) However, as the Malatesta
court noted, these cases hold that evidence of the profits of a
person other than plaintiff, who operated the same established
business at the identical location for the period of time which
plaintiff seeks damages, is not of such a speculative nature to
require a finding that plaintiff's lost profits may not be proved
to a reasonable certainty. (Malatesta, 186 Ill. App. 3d at 621-
22, 542 N.E.2d at 782.) In sum, the cases cited in Milex involve
awards based on actual profits made by established, profitable
businesses. They are all quite distinguishable from this case,
which involves an award based on the hypothetical profits of an
established, unprofitable business.
 The case which most strongly supports the damage award in
this case is Milex itself. In Milex, the plaintiff recovered
lost profit damages for a breach of a contract to manufacture a 
pharmaceutical product it had not previously marketed, based on
expert economic analysis. 
 Like the Malatesta line of cases, Milex is factually distin-
guishable from this case. In Milex, the defendant never disputed
that Milex would have marketed the product and would have made
sales. The expert calculations in this case assumed that the
entire shortfall in marketing expenses would have been applied to
SK's planned lift program. The record, however, shows this
assumption was not supported by the evidence. 
 For example, Mr. Roth testified regarding SK's September
1984 operating letter, in which the shortfall is attributed to
the usage of a "board program" in lieu of lifts. The jury was
also read the deposition testimony of Arlen Issette, an SK
employee, who explained that the board program was an alternative
to the lift program. Mr. Issette testified that lifts were
suspended during the implementation of the board program, thereby
corroborating SK's September 1984 records. Mr. Moran testified
that he had not considered the information from the September
1984 operations letter, which also summarized SK's lift expenses.
 Indeed, Moran testified that he never saw any document
reflecting the lift program expenses as a line item, despite
earlier testimony that he wanted SK's operations letters as a
source of data for his analysis. Moran also testified that the
plaintiffs gave him "various figures" for the amount of the lift
program and testified that it "could have been" $1.6 million or
"might even have been" $2.5 million. Such testimony does not
provide an assurance of reasonable certainty, particularly where
the September 1984 operations letter and expert testimony thereon
shows a planned expenditure of $1.2 million and an actual expen-
diture of $463,000, resulting in a $737,000 shortfall. (Cf.
Illinois Bell Telephone Co. v. Purex Corp., 90 Ill. App. 3d 690,
698, 413 N.E.2d 106, 112 (1980) (expert assumption is untenable
where the record shows the assumed fact easily could have been
established with a greater degree of probability).) Moran simply
applied the entire $1.6 million shortfall in marketing expense
capacity to the lift program without a clear idea of the amount
SK had planned to spend on that program. Moreover, Moran appar-
ently had no idea of how much SK actually spent on the lift
program, a fact necessary to calculating the amount, if any, of
the shortfall in planned lift program expenses.
 Moreover, as Moran did not account for the board program, he
gave no testimony as to whether spending on the board program
would have yielded comparable incremental sales or profits. 
Corcoran testified that in the early stages of the board program,
the plaintiffs believed that the board program was a good market-
ing alternative to the lift program, but later found out that it
was not.
 In sum, the record sets this case apart from Milex. Even
assuming arguendo that Moran was a credible witness, the premise
that the entire marketing shortfall would have been spent on the
lift program is speculative at best, based on the record on
appeal. The expert testimony failed to isolate the amount of
lost profit, if any, caused by Dresser, failed to account for
plaintiffs' own actions and failed to show that the analysis was
based on a true premise, as required by Midland Hotel and Damron. 
The damages are speculative and cannot stand.
 IV.
 Given that it is unclear whether plaintiffs can establish
these damages with reasonable certainty, the award of punitive
damages must also be reversed. (See, e.g., Kemner v. Monsanto
Co., 217 Ill. App. 3d 188, 199, 576 N.E.2d 1146, 1153 (1991).) 
Thus, as in Midland Hotel, F.L. Walz, and Reynolds, we conclude
that the award must be reversed and the case remanded for a new
trial on the issue of damages only.
 For all of the aforementioned reasons, the judgment of the
circuit court of Cook County is reversed and remanded for further
proceedings consistent with this opinion.
 Reversed and remanded.
 THEIS, concurs.
 BUCKLEY, dissents.
 JUSTICE BUCKLEY dissents:
 What we review here is an impeccable trial record. Prior to the
verdict, defendant never raised any legal question regarding plain-
tiffs' request for compensatory and punitive damages, and to this day,
defendant raises no questions surrounding the conduct of the trial,
the admission of evidence, the law under which the case was tried, or
the jury instructions. 
 The majority finds that plaintiffs' evidence of damages was
speculative. However, I believe the size of the award is the motive
behind the majority's opinion, and I do not believe the sheer size of
a jury award is a proper basis for such a finding. When one considers
defendant's egregious conduct proved by plaintiffs, the risks plain-
tiffs took in their endeavor, and the size of defendant, the award is
put into perspective. There is no question defendant's fraud caused
plaintiffs some amount of compensatory damage, and I believe plain-
tiffs proved this amount of damage to a sufficient degree of certain-
ty. Further, I do not believe the remittitur of the circuit court had
any basis in law. I would affirm the jury verdict of $4 million in
compensatory damages and $50 million in punitive damages for the
following reasons.
 The evidence put forth by plaintiffs proved their damages with
reasonable certainty. Plaintiffs made $4 million in spite of
defendant's fraud. Because of the financial chaos created by
defendant's misrepresentation, plaintiffs spent $1.6 million less on
marketing than their business plan had contemplated, and was agreed
upon by their lender. It is irrational to suppose that plaintiffs
would have spent the missing $1.6 million unproductively. It is more
logical to accept as true their testimony, undisputed at trial, that
they would have spent the $1.6 million on lifts, or something even
more productive. Both the jury and the trial judge accepted this as
true, and it is not this court's place to reject that finding.
 The majority mistakenly relies exclusively on Roth's direct
testimony, which gives the impression that Moran ignored the events
that occurred after plaintiffs discovered defendant's fraud. However,
these criticisms of Moran's statement miss the mark. These undisputed
events, supposedly ignored by Moran, had already been taken into
account in the underlying SK financial statements on which Moran's
statement was based.
 Borsch took Moran's incremental sales and profits, compared them
to Snap-On, made a large deduction for liquidity (30%), and arrived at
two incremental values: $6.4 million, which the jury rejected, and $4
million based on sales, which the jury accepted. Defendant's attack
was primarily directed at this testimony.
 Defendant's criticism of Borsch's valuations parrots the
testimony of Mr. Cerone, defendant's financial analyst. Cerone
testified that Snap-On is a publicly traded industry leader and SK is
not. However, Borsch allowed for this difference by discounting his
valuation by 30%. The bottom line is that neither the jury, nor the
trial judge, who were in the best position to weigh Cerone's testimony
against Borsch's, chose to deny compensatory damages based on Cerone's
testimony. Yet, now the majority reweighs Cerone's testimony and
finds it to outweigh Borsch's. The weight to be assigned expert
testimony is for the jury, who actually heard it, not appellate judges
who have only had it described to them by counsel for the verdict
loser. Treadwell v. Downey, 209 Ill. App. 3d 999, 1003, 568 N.E.2d
998, 1001 (1991).
 Aside from the fact that plaintiffs did prove their amount of
damages sufficiently, what I find even more disturbing about the
majority opinion is that it summarily dismisses the fact that
defendant failed to object to the introduction of the expert testimony
or to the jury instructions on damages. The majority states that
because plaintiffs "failed to raise this argument in their initial
brief" they waived the issue on appeal. However, plaintiffs did raise
the expert testimony argument on page 17 of its brief and made the
jury instruction argument regarding punitive damages on page 28. 
While it is true plaintiffs did not make the jury instruction argument
regarding compensatory damages until its cross-reply brief, I fail to
see how this would preclude this court from considering the jury
instruction and the fact that defendant never objected to it. In
fact, I believe it is the first thing this court should have con-
sidered once defendant made its damage argument. Since the majority
did not, I consider it now.
 "(15) If you decide for the plaintiffs on the
 question of liability, you must then fix the
 amount of money which will reasonably and fairly
 compensate them for any damages proved by the
 evidence to have resulted from the alleged
 misstatements of the defendant.
 Evidence on the following types of damages has
 been presented:
 Profits Plaintiffs lost when SK was sold
 to Falcons.
 Whether any damages have been proved by
 evidence is for you to determine.
 (16) Damages for fraud may include lost profits. 
 Such damage is the amount of reasonable certain
 net profits the plaintiffs did not earn as a
 result of defendant's wrongful conduct. Absolute
 certainty as to the amount of lost profits is not
 required, but speculative profits cannot be
 awarded. Lost profits must be proved with
 reasonable certainty." [Emphasis added.]
The rule applicable to this case was correctly stated in the agreed
jury instruction and the trial judge's decision. Absolute certainty
as to the amount of lost profits is not required. Plaintiffs' lost
profits were not speculative, they were real. All the law requires,
in cases of this character, is that the evidence shall with a fair
degree of probability, tend to establish a basis for the assessment of
damages. Barnett v. Caldwell Furniture Co., 277 Ill. 286, 289, 115
N.E. 389, 390 (1917).
 It should also be remembered that the $4 million compensatory
award was not based on lost operating profits; the jury rejected that
basis for damages. The basis for the jury's compensatory award was
lost sales. Those lost sales produced compensatory damages in the
reduced value of the company and, thus, a lower profit when they sold
the company than would have been the case in the absence of
defendant's fraud.
 Furthermore, I believe there are procedural reasons why the
jury's and the trial judge's $4 million compensatory award should
stand on appeal. It was not until the verdict that defendant raised
the legal arguments presented in this appeal. Until then, defendant
had tacitly conceded that plaintiffs' damage evidence, if believed by
the jury, would be legally sufficient. This concession is established
by the following procedural events as shown by the record.
 Although defendant made three motions in limine, none made
reference to plaintiffs' evidence of compensatory damages, and
defendant did not object to plaintiffs' damage experts when they were
called at trial. Nor did defendant raise the matter of compensatory
damages when it moved for a directed verdict at the close of plain-
tiffs' case-in-chief. On the contrary, defendant's motion for a
directed verdict at that point only argued that plaintiffs had waived
their right to consequential damages by proceeding to arbitration.
 At the close of all the evidence, defendant again moved for a
directed verdict and again there was no argument against compensatory
damages. I see defendant's appeal to this court as nothing more than
an attempt to retry the case, which is what the majority has done. It
is not our role to brandish exhibits and reconsider properly given
jury instructions that were agreed to by the parties.
 I remind the majority of the standards of review to which we are
held. A verdict is against the manifest weight of the evidence only
where the opposite conclusion is clearly evident, plain and un-
disputable, or where the findings are unreasonable, arbitrary and not
based on any evidence. Maple v. Gustafson, 151 Ill. 2d 445, 454, 603
N.E.2d 508, 512-13 (1992); Anderson v. Beers, 74 Ill. App. 3d 619,
623, 393 N.E.2d 552, 555 (1979). The trial court denied defendant's
new trial request and that ruling cannot be disturbed absent a clear
abuse of discretion. Maple, supra. Reideelberer v. Highland Body
Shop, Inc., 83 Ill. 2d 545, 548, 416 N.E.2d 268, 270 (1981). The
majority has failed to show the abuse of discretion here.
 Furthermore, even if the compensatory damage amount was specula-
tive, there is no basis for overturning the punitive award, because it
is clear plaintiffs suffered some amount of compensatory damage as a
result of defendant's fraud. Defendant's fraud actually caused two
types of harm to plaintiffs. An immediate injury in the form of an
overpayment, which the arbitrator valued at $1.3 million upon which
the Federal District Court entered judgment, and a consequential
injury, which the jury valued at $4 million 11 years later.
 Only injury is required to support an award of punitive damages. 
The case of Kemner v. Monsanto Co., 217 Ill. App. 3d 188, 576 N.E.2d
1146 (1991), cited by the majority, does not support the proposition
that the punitive damage award must be reversed. There, the appellate
court disallowed punitive damages only because it was "not a case
where there was an intentional tort alleged nor a case where damages
could not be easily compensated." In the case at bar, there was an
intentional tort and it is defendant who contends that plaintiffs'
damages could not easily be computed. Accordingly, Kemner stands for
the proposition that compensatory damages are not an essential predi-
cate to punitive damages in intentional tort cases like this one.
 I can only guess to what effect defendant's argument regarding
punitive damages had on the majority opinion. Although the majority
never reaches this issue, I cannot leave this case without stating my
belief that the trial court's remittitur had no basis in law. The
Illinois Supreme Court has never reduced a jury verdict for punitive
damages. The supreme court has either upheld or rejected such awards
in their entirety. But it has never done what the trial court did
here. Defendant does cite two cases in which Illinois appellate
courts have reduced jury verdicts: Stambaugh v. International
Harvester Co., 106 Ill. App. 3d 1, 435 N.E.2d 729 (1982), and Brown
v. Farkas, 158 Ill. App. 3d 772, 511 N.E.2d 1143 (1987). Both are
appellate verdicts giving no reason whatever for the "judicial" action
taken.
 The Illinois law is quite plain: Juries' punitive awards are to
be reviewed only for "passion, partiality or corruption." Deal v.
Byford, 127 Ill. 2d 192, 204, 537 N.E.2d 267, 272 (1989). Defendant
has never contested that the instant verdict was the product of
"passion, partiality or corruption." Those words do not appear in
defendant's post-trial filings and they have not been used in this
appeal. Moreover, Illinois law is equally clear that the measurement
of punitive damages "is peculiarly within the province of the jury." 
Collins v. Interroyal Corp., 126 Ill. App. 3d 244, 257, 466 N.E.2d
1191, 1200 (1984).
 The trial court reviewed the jury's punitive award under the
"Proctor factors." However, no Illinois authority for the application
of these factors exists. The 1994 Proctor decision was subsequently
withdrawn by the court, and thus, has no precedential value. The real
Illinois law under which the jury verdict must be reviewed is stated
in the jury instruction, which defendant proposed, and plaintiffs
agreed to. "In assessing punitive damages, you the jury, can properly
consider the following factors: 1) the nature and enormity of the
wrong; and 2) the financial status of the defendant."
 Applying this law to this case, we see at once that the $50
million verdict was appropriate. Furthermore, this award is con-
sistent with the substantive due process standard, with regard to
punitive awards, recently set by the United States Supreme Court in
BMW of North America, Inc., Petitioner v. Ira Gore, Jr., ___ U.S. ___,
134 L. Ed. 2d 809, 116 S. Ct. 1589 (1996). In BMW, the Supreme Court
considered three guideposts in determining whether the award was
"grossly excessive." These were: the degree of reprehensibility of
the defendant's conduct, the ratio of the punitive award to the actual
harm inflicted, and the civil and criminal penalties that could be
imposed for comparable misconduct. BMW, ___ U.S. ___, 134 L. Ed. 2d
809, 116 S. Ct. at 1598-99. In that case, the Supreme Court found a
punitive award of $2 million grossly excessive where BMW had repaired
redelivery damage to plaintiff's car without disclosing such repairs,
and the conduct resulted in actual damages of only $4,000. BMW, ___
U.S. ___, 134 L. Ed. 2d 809, 116 S. Ct. at 1598.
 The case before us, is clearly distinguishable in that
defendant's conduct was much more reprehensible than BMW's, and the
civil and criminal penalties for such conduct are potentially great. 
Here the punitive award is only 12 times the compensatory award, as
opposed to punitive award in BMW, which was 500 times the actual
damages.
 For all of these reasons, I would affirm the jury verdict award
of $4 million in compensatory damages and $50 million in punitive
damages and reverse the trial court's remittitur.